See, also, Dayton v. Bank, 6 Rob. 17; Greene v. Johnson, Sheriff, 21 La. Ann. 464.

The rule nisi is recalled, and relators' application is dismissed.

(117 So. 132)

No. 28928.

## PLANCHARD v. KLAW & ERLANGER NEW ORLEANS THEATRES CO. et al.

April 9, 1928. Rehearing Denied May 7, 1928.

John C. Davey, R. C. Davey, and Edward Dinkelspiel, all of New Orleans, for appellants.

Brittingham & Tycer, of New Orleans, for appellee.

THOMPSON, J. This is a suit for damages for maltreatment, abuse, and ultimate expulsion from a theater in this city.

The defendants admit the ejectment, and, as a justification therefor, allege that the plaintiff was disturbing the audience by throwing paper aeroplanes from the pit, where he was seated, into the orchestra below.

There was judgment in the court below for $2,000, and defendants have appealed.

The plaintiff has answered the appeal, and prays for increase of judgment to $6,000.

The plaintiff had purchased a ticket, and had taken a seat up in the pit at Tulane Theater to witness the run of "Abie's Irish Rose." Some little time before the performance be-

gan, a lady occupying a seat near the plaintiff fainted. The plaintiff went to her, gave her a glass of water, and began to fan her with a newspaper, when another lady in the audience asked the plaintiff to open up a window, which the plaintiff attempted, but failed, to do.

He returned to the lady, and was standing fanning her with a newspaper, when the usher or an employee of the theater approached him; and, according to plaintiff's testimony, said, "What are you trying to do?" to which plaintiff replied that he was trying to open a window for the lady. Whereupon the usher said, "You have no right to open it, sit down, or I will put you out of this theater." "Shut up, you smart Aleck, or I will slap you over." The plaintiff replied, "You will do what?" when the usher said, "I will have the police take you out of this theater." A policeman stationed at the theater was called, and, at the request of the usher, took the plaintiff from the theater.

Mrs. Praetorius, who was sitting in the row of seats just behind plaintiff, testified that plaintiff was reading a paper when the lady fainted, and that she (witness) said, "My goodness, she should have air," when the plaintiff got up and tried to open the window, but could not do so; that the plaintiff gave the lady a glass of water, and was fanning her with a paper, when the usher or watchman came up and asked who was fooling with the window, and said that, if he knew who fooled with the window, he would put him out; that plaintiff said, "Would you?" and the usher then said, "Yes; so it was you, you smart Aleck; I will have you put out; and I will slap your face," and with that he went and got the officer, who put the plaintiff out.

Mr. D. O. Babin, his wife, and a lady named Mrs. J. C. Thomas, who occupied seats about ten rows from the plaintiff, testified: That the first thing that attracted their attention was a woman fainting, and the plaintiff was fanning her.

That the young man tried to open the window—they thought he had opened it—when a young man with a derby hat on was speaking to him, and in a little while the young man called a policeman, who came and took the plaintiff and put him out.

The last three witnesses could not hear the words that passed between the usher and the plaintiff, but they saw the plaintiff fanning the lady, saw him attempt to open the window, and saw the usher approach him and thereafter call the policeman who put the plaintiff out.

None of these witnesses saw the plaintiff throwing any paper, or doing any thing unusual, except his fanning the lady, and his attempt to open the window.

The last three named witnesses did not know the plaintiff. They happened to see an advertisement in the paper asking for the name of any one who might have seen the incident, and their names were furnished plaintiff because, as they expressed it, the treatment received by the plaintiff was so uncalled for that they wanted to give him all the assistance they could.

Mr. Fred Bretz, the employee of the theater who was responsible for plaintiff's ejectment, testified that he was standing in the top of the gallery, and that the young man (meaning plaintiff) stood up, and that he saw his hand go up and saw a piece of paper fly, and that he went to him and said, "You will have to behave, or we will put you out," and he said, "You don't say so?" and I said, "Yes, I will, and you will see." He says he then went and told the officer, and the officer said, "I will watch him," and the first thing he knew the officer had gone and got him.

Mr. Kieran, the policeman referred to, testified that he received a complaint from Bretz that the plaintiff was shooting paper aeroplanes, and that he stood up in the back and watched him, and he was about to shoot another when a lady said, "Here is the police," and he put it between his knees, and "I said

to him, 'If you do not behave, I will put you out,' and he said, 'You are not big enough,' and I took him down, and he got his 50 cents, and went away."

This witness further said that the plaintiff was in a good humor, patted him on the back, and said that he had made a little mistake.

It is to be observed that the policeman is the only one to mention the throwing of paper aeroplanes. Nowhere in the testimony did Bretz make use of the words "paper aeroplanes." He was asked several times if he saw the plaintiff throw a piece of paper, and he invariably answered that he saw the plaintiff's hand in the air and something like a piece of paper go down.

The testimony of the two defense witnesses is so inconsistent with the truth of the occurrence, as established by the overwhelming weight of the testimony, as to render it absolutely incredible.

The trial judge considered the story as told by the two witnesses to be a pure fabrication, and we are constrained to agree with him.

If Bretz and the policeman had made any inquiry, or the least effort at investigation, they would have discovered what four other disinterested observers saw—that is, that the plaintiff, instead of throwing paper aeroplanes, was engaged in assisting the prostrate woman by giving her water and fanning her with a newspaper.

In the light of all of the other evidence, it is impossible to believe that the two defense witnesses had any reason whatever to conclude that the plaintiff was mischeivously casting paper into the orchestra below and not fanning the fainting woman.

■ There can be no doubt that, as a legal proposition, it is the duty of the managers of a theater to maintain proper order in and about the theater during the performance, and while the people are assembling or leaving the theater. And whenever such managers or those charged with the duty of maintaining order have reason to believe one in the audience guilty of improper conduct, calculated to alarm or disturb the audience, they are justified in taking such reasonable steps as will be necessary to put an end to the disturbance, even to the extent of ejecting the offender.

■ On the other hand, people who visit such places of amusement and entertainment, and who are not guilty of any unseemly conduct, wrongdoing, or disturbance, are entitled to full protection at the hands of the managers of the theater in the enjoyment of the privilege for which they have paid their money.

■ And where, as in this case, a patron of a theater is insulted, maltreated, and caused to leave the theater by an employee of such theater without just, reasonable, or probable cause, such theater will be held liable in damages.

■ There is no merit in the contention that the policeman was detailed to the theater to preserve the peace, and that in ejecting the plaintiff the policeman acted on his own discretion. The testimony abundantly shows that the insult and abuse of the plaintiff was made by the employee of the theater, and the ejectment of the plaintiff was at the request of such employee.

Nor is there any contention that the policeman is not liable with the managers of the theater.

■ Be that as it may, the policeman, as shown by the evidence, acted without reasonable and probable cause, and was himself guilty of using insulting language to the plaintiff.

In so acting he rendered himself liable in damages.

We are of the opinion, however, that the amount allowed by the lower court is clearly excessive.

■ We think an allowance of $500 is proper and commensurate with the nature and character of the offense committed by the defendants.

It is therefore ordered that the judgment appealed from be amended by reducing the amount allowed from $2,000 to $500, and, as thus amended, said judgment is affirmed, the costs of appeal to be paid by the plaintiff.

O'NIELL, C. J. and ST. PAUL, J., are of the opinion that the amount of damages allowed should be more nearly in proportion to the amount allowed in Buchert v. Schumacher (No. 28690) ante, p. 111, 116 So. 718, decided to-day, which was only $200.

(117. So. 134)