[No. 42080. En Banc. January 11, 1973.]

THE CITY OF SEATTLE, *Appellant*, v. HAROLD G. BITTNER *et al.*, *Respondents.*

*A. L. Newbould* and *Arthur T. Lane*, for appellant.

*Young & Hoff* and *Victor V. Hoff*, for respondents.

ROSELLINI, J.—These are consolidated criminal actions originating in the Municipal Court of the City of Seattle, wherein the respondents were charged and convicted of violating Seattle Ordinance 48022 § 22 as amended (Seattle Code § 10.04.010), in that they operated motion picture

theaters without licenses. In cases involving operation of the Mecca Twin Theatre located at 711 Pike Street, the licensee's application for a renewal of theater license had been denied by the city council on the ground that one of the licensee's officers had been convicted of exhibiting obscene motion pictures. In cases involving the operation of the Adult Book Store theater, located at 1415-1st Avenue, the application of respondent Kravitz for an initial license was denied upon the ground that the theater had been operated without a license, the application having been suspended pending the justice court prosecution of one of the bookstore employees for sale of obscene material at the premises.

Upon appeal to the superior court, the convictions were reversed, the court holding that the ordinance in question is unconstitutional upon its face. The city has appealed.

Pertinent portions of Seattle Ordinance 48022 § 11 as amended, are as follows:

10.02.100 Licenses granted by council—Application procedure and information required  The following licenses may be granted only by the city council:

. . .

(6) Theater licenses

. . .

Application for any of the above shall be made in the office of the city comptroller on a form prepared by him substantially as follows:

. . .

. . . The comptroller shall forward all such license applications to the city council which before acting upon the same shall request the chief of police to investigate the truth of the statements in the application and all other matters which might tend to aid the council in determining whether to grant the license. The chief shall report to the council as to reasons he may have for objecting to the granting or renewing of the license. If the council is satisfied that the statements in the application are true, that the applicant and all persons connected with the business are of good character and that the premises in which the activity sought to be licensed will be conducted comply with the requirements of all ordi-

nances relating to buildings, fire, health and sanitation, and that such premises are situated in a place where such businesses are not prohibited by the Zoning Ordinance or other law and that all other requirements and conditions of this chapter relating to the business for which the license is sought have been met, it shall by resolution direct the city comptroller to issue such license, otherwise it shall deny the same; Provided, however, that if the applicant (or if a corporation, any of its officers) has within ten years of the date of application been convicted of any felony or any misdemeanor involving moral turpitude or intent to defraud, or has within ten years of the date of application been released from a penal institution or from active supervision on parole as a result of any such conviction, no such license shall be granted; Provided, further, however, that the city council may waive not to exceed five years of such period upon satisfactory showing by the applicant of rehabilitation. The city council may grant any license as a probationary license for such time and under such conditions as it may deem necessary to insure continued adherence to this or other ordinances, but no probationary license shall be granted to anyone not qualified for licensing under this chapter.

It will be observed that this ordinance lodges in the city council discretion to deny a license if it fails to find that an applicant and "all persons connected with the business" are of good character. It also provides that a license may not be granted to any person who has been convicted of a crime "involving moral turpitude or intent to defraud" within 5 years of the date of application. It is these provisions which the respondents contend and which the trial court held constitute an improper use of the licensing power to restrain the exercise of rights guaranteed under the first amendment to the United States Constitution and Const. art. 1, § 5.

As we said in *Fine Arts Guild, Inc. v. Seattle,* 74 Wn.2d 503, 445 P.2d 602 (1968), it is now well settled that motion pictures and plays are a form of expression entitled to the constitutional guarantees of free speech and press. Also well settled is the proposition that any restraint imposed upon a constitutionally-protected medium of expres-

sion comes into court bearing a heavy presumption *against* its constitutionality.

The ordinance in question denies to certain classes of citizens—those who in the opinion of the city council are not of good character, and those who have been convicted of a certain type of crime within a specified period—the right to engage in the business of showing motion pictures.

In seeking to justify these restrictions, the appellant maintains that they constitute a proper exercise of its licensing power. It cites the case of *Tarver v. City Comm'n*, 72 Wn.2d 726, 731, 435 P.2d 531 (1967). In that case we said of the licensing power when used for regulatory purposes:

> The wisdom and propriety of a municipal ordinance establishing certain standards, regulations or controls for a particular business or occupation is not a question for this court to decide; rather, the scope of our review is limited to determining whether the ordinance is within the scope of municipal power and whether the ordinance and the actions taken pursuant thereto are arbitrary, capricious or unlawful.

We examined prior cases in which we had considered restrictions placed upon various enterprises by municipal authorites and concluded that the authority to regulate varies, depending upon the type of activity or enterprise involved. We said that generally businesses and occupations fall into one of three categories—those which are pursued by private means upon private property; those which involve some social or economic evil, such as gambling or liquor traffic, or which may, under certain circumstances, become a nuisance or hazard to the public health and safety; and those which involve the use of public property such as streets or parks.[1]

*Tarver v. City Comm'n, supra,* was an action in which a taxicab operator challenged the constitutionality of an ordinance which bestowed upon the city commission dis-

---

[1]We are here concerned only with the power of municipalities to license businesses. Other considerations apply in the licensing of vocations and professions such as teaching, and the practices of medicine and the law. *See* 16 Am. Jur. 2d *Constitutional Law* § 323 (1964).

cretion to deny a license to a person who was not found to be of good moral character and reputation. We observed that the character of a driver of a taxicab is a relevant factor in determining his qualifications for a license, because of the safety hazards involved as well as the temptation to engage in illegal activities such as liquor traffic, and further that the taxicab operator uses the public streets to pursue his business. For these reasons, we said, the power to regulate is broader than it would be in the case of a business carried on upon private property and involving no extraordinary hazards or risks of illegal activities.

We held in that case that the discretion lodged in the city commission was not inappropriate to effect the legitimate purposes of the licensing act, noting that the exercise of that discretion would be subject to judicial review for arbitrariness, and that the factors considered must have a reasonable relationship to the licensed occupation.

Another case in which we have recently sustained the right of a licensing authority to inquire into the character of an applicant is *State ex rel. Pitkanen v. Zittel*, 77 Wn.2d 366, 462 P.2d 944 (1969). In that case, the petitioner was refused a license as a special policeman by the Tacoma chief of police, to whom the duty to pass upon the qualifications of applicants for such licenses had been delegated by the city manager. The petitioner contended that, since his services would be performed entirely on private property, the public had no legitimate interest which required the regulation of his vocation. However, we pointed out that the badge of a special policeman indicates to those persons whom he serves that he has been approved by the city police and can be trusted to guard the client's property and not abuse his position. In sustaining the denial of the license, we also observed that any abuse of discretion by the licensing authority was subject to judicial review.

On the other hand, we held in *State ex rel. Makris v. Superior Court*, 113 Wash. 296, 193 P. 845, 12 A.L.R. 1428 (1920), that one engaged in the business of selling soft

drinks and candy on private property could not be denied a license at the discretion of the licensing authority. We said in that case that an ordinance which authorizes the issuing or withholding of a license to engage in a business which within itself is ordinarily perfectly lawful, and commits to any officer or set of officers the power to decide according to their notions in each particular case the question of the propriety of issuing or withholding a license therefor, and thus to decide who may and who may not engage in such business, is authorizing the exercise of arbitrary power in violation of the fourteenth amendment to the United States Constitution, which provides that "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

We said further:

> We do not in our present inquiry take note of decisions which have to do with the granting of licenses for the sale of intoxicating liquors, the maintenance of pool rooms, the practice of professions, or entering upon occupations more or less dangerous to others, looking to the personal qualifications of the licensee. As to such licenses there is necessarily involved some measure of discretion to be exercised by the officer or body charged with the duty of deciding who may or may not engage in such businesses, professions, or occupations. Such cases do not deal with constitutional rights so clearly ascertainable as those drawn in question in this case.

113 Wash. at 307.

Also, in *Vincent v. Seattle,* 115 Wash. 475, 197 P. 618 (1921), we held unconstitutional an ordinance vesting unbridled discretion in the city council to revoke a license for the operation of certain amusement devices on private property. We said that the operation of a place of public amusement, on private property, involves nothing which is necessarily inherently evil, and the limit of legislative power thereover is to regulate only. *See also Seattle v. Gibson,* 96 Wash. 425, 165 P. 109 (1917).

It will be seen, then, that the extent to which a licensing authority may exercise discretion in the granting

754

or withholding of a license depends upon the type of business or vocation which is involved. But even where the character of an applicant is subject to evaluation by the licensing officer, the matters which he takes into account must be relevant to the particular activity which is to be licensed. This rule is implicit, if not expressed, in all our cases and was made abundantly clear by the United States Supreme Court in *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239, 1 L. Ed. 2d 796, 77 S. Ct. 752 (1957). Speaking of the authority to license the practice of law, that court said:

A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law.

Having in mind these principles we turn to Seattle's ordinance authorizing the city council to license the operation of motion picture theaters. The appellant does not deny that a motion picture theater is a private business carried on upon private property. There is no suggestion that the respondents use or claim any right in public property for the conduct of their enterprises.

There is also no contention that the respondents' theaters are in violation of applicable zoning regulations. There are, of course, possible health and safety hazards involved in the operation of a theater, and the respondents do not question the right of the city to regulate such establishments in this regard. But the appellant does not suggest that the character of the applicant is in any respect relevant to the prevention of fire hazards or the maintenance of sanitary conditions. It quite frankly concedes that the purpose of the provisions of the licensing ordinance which relate to the character of the applicant is to reduce the likelihood of obscene movies being shown.

Thus, the ordinance is designed to place a restraint upon the conduct of a lawful business, upon private property, which involves the exercise of one of the fundamental free-

doms—the freedom of expression—which is protected under both the federal and state constitutions.

Recognizing that this court has held, in *Fine Arts Guild, Inc. v. Seattle*, 74 Wn.2d 503, 445 P.2d 602 (1968), that prior restraint of the exhibition of motion pictures can be resorted to only under very limited circumstances, the appellant argues that the ordinance provisions are merely punishment for past offenses involving the showing of obscene movies.

The appellant does not advise us of the source of its authority to use its licensing power as a vehicle for the imposition of criminal penalties, much less to use that power to punish an applicant for a second time for past offenses. Presumably an applicant who has been found guilty of showing an obscene motion picture has paid the penalty provided by law for that offense.

> If there is anything settled in the jurisprudence of England and America, it is that no man can be twice lawfully punished for the same offence. . . .
>
> . . .
>
> . . . [O]f what avail is the constitutional protection against more than one trial if there can be any number of sentences pronounced on the same verdict? . . .
>
> . . . [W]e do not doubt that the Constitution was designed as much to prevent the criminal from being twice punished for the same offence as from being twice tried for it.

*Ex parte Lange*, 85 U.S. (18 Wall.) 163, 168, 21 L. Ed. 872 (1873). *See also Davis v Catron*, 22 Wash. 183, 60 P. 131 (1900).

■ But we need not consider the propriety of the use of the licensing power as an instrument of punishment. What the appellant labels "punishment" is in fact an attempted prior restraint upon the exercise of a constitutional freedom.

The appellant has apparently proceeded upon the assumption that a person who has been convicted of the offense of exhibiting an obscene movie, under RCW 9.68.010, is more likely than not to commit this offense

again. This must mean that, in its opinion, the imposition of penalties under the criminal law has neither a deterrent nor a rehabilitative effect, and further that the penalties prescribed are not adequate punishment for the offense. Whether or not this assumption has any validity, we are convinced that the constitution does not permit a licensing agency to deny to any citizen the right to exercise one of his fundamental freedoms on the ground that he has abused that freedom in the past. No case is cited which supports such a proposition and our research has revealed none.

In *Adams v. Hinkle,* 51 Wn.2d 763, 322 P.2d 844 (1958), this court had under consideration a statute, Laws of 1955, ch. 282, which required a license of anyone selling or possessing for sale any book, magazine, or pamphlet of a specified type, and imposed punishment for sale of such material without a license. We said that this device, which imposed punishment not for selling something which might be considered harmful (in that case, crime comic books), but rather for failure to obtain a license, is prior restraint in its most abhorrent form.

We quoted with approval the following from an article by Professor Thomas I. Emerson of the Yale Law School, which appeared in 20 Law and Contemporary Problems 648 (1955):

> The concept of prior restraint, roughly speaking, deals with official restrictions imposed upon speech or other forms of expression in advance of actual publication. Prior restraint is thus distinguished from subsequent punishment, which is a penalty imposed after the communication has been made as a punishment for having made it. Again speaking generally, a system of prior restraint would prevent communication from occurring at all; a system of subsequent punishment allows the communication but imposes a penalty after the event. Of course, the deterrent effect of a later penalty may operate to prevent a communication from ever being made.

We also quoted the following from the leading case of

*Near v. Minnesota,* 283 U.S. 697, 713, 716, 75 L. Ed. 1357, 51 S. Ct. 625 (1931):

> In determining the extent of the constitutional protection, it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication. . . .
>
> . . .
>
> . . . That is undoubtedly true; the protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases: . . .
>
> The exceptional nature of its limitations places in a strong light the general conception that liberty of the press, historically considered and taken up by the Federal Constitution, has meant, principally although not exclusively, immunity from previous restraints or censorship.

Because the licensing act constituted an impermissible prior restraint, and for other flaws in its composition, we held it unconstitutional.

As we observed in that case, not all prior restraint of free expression is forbidden. Distribution of obscene material or the showing of an obscene picture may be restrained, but certain safeguards must be observed, including provision for prompt judicial review of the censor's decision. *Fine Arts Guild, Inc. v. Seattle, supra; Freedman v. Maryland,* 380 U.S. 51, 13 L. Ed. 2d 649, 85 S. Ct. 734 (1965). The ordinance here in .question does not purport to restrain only the showing of obscene motion pictures, neither does it provide any of the procedural safeguards which we have said must be observed if a particular motion picture is sought to be suppressed. It is not a permissible form of prior restraint.

The appellant acknowledges that a similar licensing statute recently has been declared unconstitutional by our sister court in California, in *Perrine v. Municipal Court,* 5 Cal. 3d 656, 488 P.2d 648, 97 Cal. Rptr. 320 (1971). However, it attempts to distinguish that case upon the ground that it dealt with the licensing of a bookstore, rather than a motion

picture theater. If any distinction has been made in the cases between the quality of freedom guaranteed by the federal and state constitutions in communication through the medium of motion pictures and through the medium of books, the appellant has failed to bring it to our attention.

The distinction which the appellant makes is that a bookstore is a far less "public" type of operation than a motion picture theater. Assuming without agreeing that this is true, we know of no historical or rational basis for the proposition that the wider the public which a communication reaches, the greater the power of the censor to restrict it. The notion that ideas should not be widely disseminated is probably acceptable in a totalitarian society, but it has no place in one which bases its system upon the belief that an informed and enlightened public is necessary if a just and responsive government is to be maintained.

In a very able opinion written by Chief Justice Wright, the California court, in *Perrine v. Municipal Court, supra,* determined that the licensing act there under consideration was void because it failed to provide objective standards for determining eligibility. The court went further and considered the question which is before us in this case, whether a licensing authority may deny a license to exercise a First Amendment freedom on the ground that the applicant has previously been convicted of a crime. It said:

> Moreover, we believe that even if the ordinance limited its disqualification to applicants who had either been convicted of one or more of the enumerated crimes or whose adequately defined coparticipants in the proposed business had been so convicted it would nevertheless be invalid.
>
> Even in the absence of First Amendment considerations, an ordinance regulating the right to engage in a lawful occupation or business must bear a rational relationship to a valid governmental purpose. [Citations omitted.] Accordingly, standards for excluding persons from engaging in such commercial activities must bear some reasonable relation to their qualifications to engage in those activities. [Citations omitted.] In the present case we perceive no reasonable relation between the qualifica-

tions of an applicant to operate a bookstore and any past conviction of any of the vast number of crimes listed in section 329.4 he or any of his coparticipants may have suffered.

Participants in the business of selling books require no special expertise. They are not like doctors or lawyers or school teachers whose past criminal convictions are often directly related to their occupational qualifications and may therefore be reasonably invoked to bar them from practicing their professions. [Citations omitted.] . . .

It is contended, however, that at least as to crimes involving obscenity, there is a reasonable relationship between conviction of such crimes and the operation of a bookstore. Accordingly, it is urged that the commission lawfully denied petitioner's application for a license on the basis of his conviction for violating Penal Code section 311.2. This contention cannot stand in the face of the First Amendment. . . . [S]ince a denial of a license would prohibit petitioner from engaging in an activity protected by the First Amendment, it could only be justified, even under a narrowly drawn ordinance, if permitting a person who had been convicted of a crime involving obscenity to operate a bookstore constituted a clear and present danger of a serious, substantive evil. [Citations omitted.] No such clear and present danger appears. We cannot assume that because petitioner was once convicted of violating Penal Code section 311.2, he will violate it again, or that if he does so, criminal sanctions will not afford an adequate remedy. . . .

To interpret the ordinance in this case to permit denial of a license because of a past conviction of violating Penal Code section 311.2 would do more than create a hazard to protected freedoms; it would suppress them altogether. The penalty for violating section 311.2 does not include a forfeiture of First Amendment rights, and the risk that criminal sanctions will be insufficient to deter future violations of that section cannot justify the county's attempted forfeiture of those rights on the theory that past violators are unfit to operate bookstores.

(Footnote omitted.) 5 Cal. 3d at 663.

The rationale of that opinion is in complete harmony with our cases dealing with the licensing powers of municipalities and their powers of censorship. We adopt it here-

with and hold, as did that court, that a municipality may not use its power to license theaters as a tool of blanket censorship, as was done in this case.

■ The ordinance being unconstitutional upon its face, the respondents committed no crime in operating their motion picture theaters without having first obtained the licenses required under its terms.

The judgments are affirmed.

FINLEY, HAMILTON, STAFFORD, WRIGHT, and UTTER, JJ., concur.

FINLEY, J. (concurring)—As I read the majority opinion, it clearly points out that the instant case does not involve any efforts of the city to proscribe or enforce appropriate licensing standards for theatres regarding fire, sanitation, structural or other hazards affecting the safety and health of members of the public who patronize such places. Standards of this genre are well within the ambit of municipal police power. Unquestionably such standards have been and would be sustained and even encouraged by this court as an exercise of the police power most appropriately in the public interest. The regulation in this case has a distinctly different complexion, or purpose and object. Thus the alarms expressed by the dissent as to health and safety standards and the citation of case and other authorities in support of such standards all seem to be somewhat beside the point to say the least. For these particular reasons and for other reasons well stated therein, I have signed and fully concur in the majority opinion.

STAFFORD, J., concurs with FINLEY, J.

HALE, C.J. (dissenting)—Rarely has it been recorded that anyone mistook a bookstore for a movie house. That is, not until now. Apparently in contemplating the current cultural scene where some bookstores are known to sell and show both movies and books, the court reached what to me is a curious conclusion that, if bookstores cannot constitutionally be licensed, neither can motion picture theaters. I

see little relationship, however, between an ordinance licensing bookstores and one licensing a motion picture theater. Thus, I find inapplicable the court's conclusion from *Perrine v. Municipal Court,* 5 Cal. 3d 656, 488 P.2d 648, 97 Cal. Rptr. 320 (1971), that, because it is unconstitutional to license bookstores in California, it is likewise unconstitutional to license motion picture theaters in Washington.

Unlike bookstores, theaters of one kind or another, whether of the legitimate stage, vaudeville, variety, or circus, have been subject to regulation and licensing virtually since colonial times in this country. The distinctions between bookstores per se and motion picture theaters per se, and the business of operating either, are in law so clear and definitive that no court should have much difficulty in recognizing them. And the distinction between an ordinance, such as the one which the court now voids, and one purporting to demand a license of an innocent bookseller should be equally clear when it comes to legislation enacted under the police power to protect the public from danger and obviate the hazards of fire, flood, contamination, structural collapse, air pollution, traffic congestion, crime and exposure to obscenity and pornography. Accordingly, I find unacceptable the court's syllogism derived from *Perrine* that, because a city ordinance purporting to license bookstores is unconstitutional as abridging freedom of speech, so, too, is one licensing motion picture shows, massage parlors, cabarets, pool halls and other similar enterprises where speech is singularly free and untrammelled.

Theaters are but one of many kinds of businesses subjected to this particular licensing measure; the ordinance includes massage parlors, bowling alleys, drive-in theaters, poolrooms, cabarets, public bathhouses, public dance halls and the like. 2 Seattle Code § 10.02.100. It is a licensing measure having roots in the long-held legislative view that movie houses, theaters, pool halls, cabarets, bowling alleys, massage parlors and similar callings of public invitation are particularly susceptible to public hazard.

If a city has a reasonable basis to assume that these enterprises may, because of their peculiar nature, adversely affect the public peace, health, safety, welfare and morals, I think the constitutions allow it to impose reasonable conditions for the issuance of a theater or similar license—and make its issuance or continuance dependent on good conduct and good moral character.

A motion picture house does present unusual hazards which warrant licensing; it is a business which from time to time compresses large crowds into a comparatively small space; it attracts large groups of people en masse to a central point, and frequently keeps them there at late and unusual hours in close proximity to the theater's premises. It is a business operated for profit that necessarily exposes the public to aggravated risks from fire, explosion, structural defects, faulty wiring, ventilation and plumbing and extraordinary traffic hazards—not to mention the actions of criminals who seek out crowds. And, like cabarets, taverns and other places of public entertainment, it may, by employing sound amplification systems, become a source of noise and commotion at late and unusual hours. The legislative authority is justified in assuming, therefore, that a motion picture house requires more inspection services and policing in the interest of public safety and welfare than does a bookstore, grocery store, department store, real estate office and the like and in requiring that it be licensed.

The power to regulate and prescribe licensing in the public interest thus rests on the traditional view that it is good for society to have businesses of this sort in the hands of noncriminals and persons of reasonably good moral character; that procurers, pimps, racketeers and other criminals —reformed or active—are not apt to have sufficient devotion to the public welfare and safety in the operation of a motion picture theater; that good citizens more likely than bad citizens and criminals will abide by the laws designed for the public protection and spend part of their profits for public safety; that good citizens will not leave the public safety exclusively dependent upon rigorous inspection and

policing. Although the judiciary may not share these legislative judgments, this presents no reason in law whatever why they are not within the legislative authority's competence to make them. The legislative authority has reasonable grounds to reach these conclusions and thus make the licensing of theaters constitutional where, for example, the same reasons might not obtain for licensing bookstores, grocery stores, delicatessens and the like. *Greenberg v. Western Turf Ass'n*, 148 Cal. 126, 82 P. 684 (1905), *aff'd*, 204 U.S. 359, 51 L. Ed. 520, 27 S. Ct. 384 (1907).

The right of the state or city to regulate, supervise and exercise control over theaters and places of public amusement is universally recognized and until this case not doubted. *Greenberg v. Western Turf Ass'n, supra; Hollywood Theatre Corp. v. Indianapolis*, 218 Ind. 556, 34 N.E.2d 28 (1941); *People v. Weller*, 237 N.Y. 316, 143 N.E. 205, 38 A.L.R. 613 (1924), *aff'd*, 268 U.S. 319, 69 L. Ed. 978, 45 S. Ct. 556 (1925). *See* 4 Am. Jur. 2d *Amusements and Exhibitions* § 12 (1962). Accordingly, the capacity to license and regulate theaters and places of public amusement as a component of the police power is perhaps even more deeply rooted in our law than for many other types of businesses. The reasons, well annotated, are in part set forth in 4 Am. Jur. 2d *Amusements and Exhibitions* § 12 (1962), as follows:

> While the business or occupation of conducting a theater or public amusement is not, in a strictly legal sense, such a public utility or so charged with a public interest as to deprive the owner or proprietor of his legal right to control and operate it as a private business, the right of the state either directly, or through a political subdivision, usually a municipal corporation, to regulate, control, and supervise places of public amusement under the police power of the state is universally recognized. *Indeed, greater discretion is permissible in the regulation of public amusements than in the case of ordinary or useful trades and occupations, both because they are liable to degenerate into nuisances and because they require more police surveillance and police service.* Further, these tendencies may justify a greater degree of control in

regulating certain particular public amusements and exhibitions than others; certain places of public amusement, because of their tendency to promote idleness, disorder, or immorality, or otherwise to subvert the public welfare, are commonly regarded by the courts as peculiarly within the power of the state or its duly empowered subdivisions to suppress or prohibit.

(Italics mine.)

On the question of free speech, it is difficult to discern where operating a motion picture theater or a cabaret or other theaters, for that matter, differs materially from the other licensed businesses where speech is the medium of communication. Freedom of speech seems indigenous to most of these business operations, and a theater is but one of many forms of commerce or business subject to licensing, regulation and inspection where speech is an essential component of business procedure. *Schine Chain Theatres, Inc. v. United States,* 334 U.S. 110, 92 L. Ed. 1245, 68 S. Ct. 947 (1948); *Binderup v. Pathe Exch., Inc.,* 263 U.S. 291, 68 L. Ed. 308, 44 S. Ct. 96 (1923). Accordingly, the employment of speech for the conveyance of ideas is no more fundamental to operating a picture show business than it is to innumerable other kinds of businesses. On that point, it should be noted the City of Seattle does not in this ordinance purport to precensor any particular film nor impose any restriction on the communicating of any ideas. The licensing ordinance purports no more than the exercise of the city's constitutional powers to require applicants for a license to show that they are of reasonably good moral character and whatever criminal career they may have had is in the substantial past.

In considering freedom of speech as it applies to the operation of a theater, one has difficulty in finding where it is anywhere more directly abridged than by the operators of motion picture theaters themselves as a matter of routine business procedure. The audience is not only invited not to but actually prohibited from audibly communicating their ideas to one another during the show either about the

movie being shown in particular or other subjects in general. As a condition of his contract of admission to the theater, the motion picture theater proprietor thus directly imposes marked restrictions on his customers' freedom of speech. Talking during the show is ordinarily deemed not only a nuisance to others but subjects the annoying patron to lawful eviction by the proprietor.

If movie patrons insist on exercising their freedom of speech to the point where it denies other patrons of the quiet enjoyment of the show, they may be evicted from the premises. The operator of a movie house or other place of public amusement is under a duty to maintain proper quiet and good order (*Edwards v. Hollywood Canteen*, 27 Cal. 2d 802, 167 P.2d 729 (1946)), and may use reasonable force to eject one who refuses to leave and persists in noise and disorder. *Cummins v. St. Louis Amusement Co.*, 147 S.W.2d 190 (Mo. App. 1941); *Planchard v. Klaw & Erlanger New Orleans Theatres Co.*, 166 La. 235, 117 So. 132, 60 A.L.R. 1086 (1928). Anyone authorized by law to exercise such powers should, in the public interest, be subject to licensing.

This court's opinion declaring void the licensing of theaters will directly curtail a reasonable and legitimate capacity for municipal self-government. The power of a state or its municipal subdivisions to supervise theaters and impose reasonable conditions upon the right to engage in some callings, businesses or professions has since colonial times been an attribute of sovereignty and an indispensable ingredient of the general police power to provide for the general welfare and preserve and foster the public peace, health, safety and morals. And none of the licensing provisions, if they are reasonably designed to attain a constitutionally permissible end and do not exact prohibitive and confiscatory fees, have been deemed a trespass on the freedom of speech regardless of the quantum of free speech employed in operating the licensed business.

Thus, this court has upheld a statute which provides for

the licensing and regulation of barbers and barbershops (*State v. Sharpless,* 31 Wash. 191, 71 P. 737, 96 Am. St. Rep. 893 (1903)), and one should assume it would stick to that ruling despite common knowledge that nowhere on the face of the American scene is speech more freely excerised than in such places. Again, a city ordinance requiring a license for billiard and pool tables, and requiring an application for the license to be filed with the city comptroller and passed on by a license committee and the city council, was held good in *State ex rel. Sayles v. Superior Court,* 120 Wash. 183, 206 P. 966 (1922). Probably no greater bastion of free speech can be found in the country than in the nation's pool halls, yet pool hall licensing was sustained again in *State ex rel. Reedhead v. Olympia,* 122 Wash. 239, 210 P. 371 (1922); and the same rule has been applied with respect to the licensing of dance halls. *Bungalow Amusement Co. v. Seattle,* 148 Wash. 485, 269 P. 1043, 60 A.L.R. 166 (1928). Plumbers are another example. A journeyman plumber in this country enjoys a reputation for free and colorful speech but ordinances requiring him to take examinations and demonstrate competency to obtain a license were upheld as being within the reasonable exercise of the police power. *Tacoma v. Fox,* 158 Wash. 325, 290 P. 1010 (1930); *Lund v. Bruflat,* 159 Wash. 89, 292 P. 112 (1930).

Accordingly, one can find no abrogation of freedom of speech whatever within the context of the First Amendment in 2 Seattle Code § 10.02.100, which requires licenses for the operation of bowling alleys, drive-in theaters, theaters, coffee houses, billiard and pool tables, cabarets, massage parlors, public bathhouses and public dance halls—and other kinds of businesses enumerated in that section. Free speech is an indigenous concomitant of each of these businesses; it is as essential to one as it is to the other. That these businesses flourish in Seattle demonstrates that the freedom of speech amendments yet reign there.

Nor do I think that the City of Seattle is depriving the applicants for a license either of due process of law, or of

equal protection, or of freedom of speech when it requires them to disclose whether they have ever been convicted of (1) violating any laws relating to intoxicating liquor, gambling, public morality, and decency or fraud, or (2) sale, use, possession, or business concerning narcotic drugs. Nor has the city exceeded its police power in requiring the applicant for a license to state in writing whether the premises upon which the licensed business will be conducted complies with the building code and the ordinances relating to health and sanitation, and to specify the size of the premises and number of pool and billiard tables, theater seats and number of bowling alleys; nor to require disclosure of the identity of each person sharing in the profits and who are citizens of the United States and those who are not citizens. These demands for information seem to me to ask no more than the city has a right to ask in achieving a legitimate legislative end by reasonable means.

The legislative purpose of the licensing law thus becomes quite clear in the provision requiring the chief of police to investigate the truth of the information set forth in the application and to give his reasons to the city council for whatever objections he may have to the granting or renewal of a license and in the provision that

> If the council is satisfied that the statements in the application are true, that the applicant and all persons connected with the business are of good character and that the premises in which the activity sought to be licensed will be conducted comply with the requirements of all ordinances relating to buildings, fire, health and sanitation, and that such premises are situated in a place where such businesses are not prohibited by the Zoning Ordinance or other law and that all other requirements and conditions of this chapter relating to the business for which the license is sought have been met, it shall by resolution direct the city comptroller to issue such license . . .

So far as licensing and due process in granting a license is concerned, this court passed squarely upon the issues of

the instant case in *State ex rel. Pitkanen v. Zittel*, 77 Wn.2d 366, 462 P.2d 944 (1969), a unanimous en banc decision denying a mandamus to compel the issuance of a special policeman's license. We upheld the constitutionality of a city ordinance remarkably similar to the one here questioned where the chief of police had refused to grant a special policeman's license because the chief had concluded that three arrests, *without any conviction,* indicated a want of good moral character. The court said, at page 367:

He [the applicant] also urges that the ordinance providing for the issuance of licenses in the discretion of the city manager is unconstitutional because no standards are provided. Standards are provided, however, in section 7.10.030 of the Tacoma City Ordinance, which requires that the applicant must show good character, competency, and integrity, must furnish character references and a bond, and must list any previous police record. Where the activity to be licensed is one in which the public has a legitimate interest which requires its regulation, the vesting of discretion in an executive or administrative officer to determine whether qualifications of this sort exist is within the police power. *Tarver v. City Comm'n of Bremerton,* 72 Wn.2d 726, 435 P.2d 531 (1967). If the officer makes an arbitrary or capricious decision, that decision is subject to review by the courts in an action such as this. This contention of the appellant is likewise without merit.

As in *Pitkanen,* the ordinance now before the court makes ample provision for due process to challenge the denial of a license and, similarly, upon showing of good behavior, for a waiver of 5 of the 10-year interval following felony conviction.

If the chief of police, for example, recommends against the granting of a cabaret or massage parlor license to a notorious pimp or prostitute, racketeer or other criminal, the applicant has ample opportunity under the ordinance to challenge the recommendation of the chief of police, to demonstrate that it is ill-founded, and to show that the applicant not only has never been convicted of such an offense but additionally has led an honest, upright and

moral life. And the same opportunity is available to every applicant for such a license whether the refusal has been based on prior convictions or substantial evidence of criminal activity falling short of actual conviction.

In declaring the freedom of speech as a basis for prohibiting the licensing of motion picture theaters, the court mistakes the medium for the message, the hall for the lecture, the building and furnishings for the film. Plaintiffs had been convicted of publicly showing obscene movies for money; under the city ordinance, this established two grounds for denial of a license, (1) timely conviction of an offense involving moral turpitude, and (2) that within the meaning of the licensing law, they were of bad moral character.

The constitution—particularly the First Amendment providing for freedom of speech—does not prevent a state or the city from seeing to it that certain businesses and callings deemed by the legislative branch to be especially sensitive in the area of public peace, health, safety and morals, are not operated by unrehabilitated felons or others of bad moral character. Thus, it is sound public policy, as well as within the constitutions, I think for the city to take all reasonable steps available to see to it that theaters, pool halls, bowling alleys, cabarets, massage parlors, pawnshops, private detective agencies, and the like, do not fall into the hands of pimps and prostitutes, thugs and racketeers and unrehabilitated felons—and all of the other diverse and sundry malefactors of a big city of whom it can be shown are of bad moral character. Licensing laws, while they do not guarantee such a result, are, nevertheless, only one of a few legal avenues open to provide it.

I would, therefore, reverse.

HUNTER, J., concurs with HALE, C.J.