[No. 30422-1-III.   Division Three.   April 12, 2012.]

ROBERT CATSIFF, *Appellant*, v. TIM MCCARTY ET AL.,
*Respondents*.

*Michael E. De Grasse*, for appellant.

*Timothy J. Donaldson*, *City Attorney*, for respondents.

¶1 BROWN, J. — Robert Catsiff appeals a superior court decision affirming a Walla Walla administrative order mainly deciding a sign he painted on his store violated size and height restrictions of the city's sign code. We reject Mr. Catsiff's federal and state free speech contentions, deny his attorney fee request, and affirm.

## FACTS

¶2 Mr. Catsiff owns and operates the Inland Octopus toy store and gift shop in Walla Walla. In 1991, the city enacted a sign ordinance as part of a coordinated downtown revitalization plan to further central business district (CBD) renovation and to preserve and restore its historic resources. Consistent with city visual-quality policies designed to improve the appearance of the downtown area, the city recognized that "[p]articular attention needs to be given to signing in the [CBD]." Clerk's Papers (CP) at 360. On March 27, 1991, the city council resolved to form a local improvement district to finance the installation of downtown revitalization improvements and passed a complementary zoning ordinance including the city's sign code at its next meeting.

¶3 The 1991 sign code's stated purpose was to improve the city's visual quality by accommodating and promoting sign placement "consistent with the character and intent of the zoning district; proper sign maintenance; elimination of visual clutter; and creative and innovative sign design." WALLA WALLA MUNICIPAL CODE (WWMC) 20.204.010. The city adopted wall sign size and height requirements for Walla Walla's CBD. Wall signs are limited to 25 percent of a wall area, and no combination of sign areas may exceed 150 square feet per street frontage. WWMC 20.204.250(A)(4), (5). In addition, signs cannot extend higher than 30 feet above grade. WWMC 20.204.250(A)(8).

¶4 In 2002, the city designated a "downtown area" as a subset of its CBD. It then adopted design standards in 2003 that contained signage requirements applying to the downtown area. Similar to the sign code, the downtown design standards disallow wall signs higher than 30 feet above grade, provide that wall signs shall not exceed 25 percent of a wall area, and limit sign areas to 150 square feet per street frontage. WWMC 20.178.110.

¶5 In March 2004, Mr. Catsiff opened the Inland Octopus toy store at 220 East Main Street. He applied for, and was issued, a sign permit. In February 2010, desiring to change business locations, Mr. Catsiff leased 7 East Main Street within the city's CBD and downtown area. He told the owner he wanted to paint a wall sign depicting a hiding octopus on the exterior back wall of his store. On March 18, Mr. Catsiff submitted a business registration application to the city for the 7 East Main Street location. The application contained a notification above the signature line that Mr. Catsiff "will need to obtain a sign permit prior to construction or installation of any exterior sign." CP at 644.

¶6 In late April 2010, Mr. Catsiff painted a wall sign depicting an octopus hiding behind a rainbow over the rear entrance of the store. He did not apply for a permit before painting it. In September, Mr. Catsiff painted on the store front an octopus hiding behind several buildings with a rainbow above the buildings; Mr. Catsiff concedes the front sign exceeds the city's height and width limits.

¶7 Acting Walla Walla City Manager Tim McCarty issued a notice of civil violation to Mr. Catsiff and his landlord regarding both signs on October 14, 2010 for violating the city's sign code permitting requirements, and the sign size and height requirements of the sign code and the downtown design standards. At the violation hearing, Mr. Catsiff stipulated factually to his violations but asserted the regulations were unconstitutional. The city's hearing examiner concluded he violated the WWMC by failing to get sign permits before painting his back and front wall signs and by

failing to get a right-of-way permit before using the public sidewalk as a staging area to paint the front sign. The hearing examiner further ruled the front sign constituted a continuing violation of the size and height requirements of both the sign code and the downtown design standards.

¶8 Mr. Catsiff appealed to the superior court, requesting declaratory and injunctive relief. The court issued a letter decision on April 28, 2010 rejecting Mr. Catsiff's constitutional claims and affirming the hearing examiner's decision. On June 1, 2010, the court entered findings of fact and conclusions of law and judgment in favor of the city. The Washington Supreme Court declined Mr. Catsiff's petition for direct review and transferred the matter to this court.

## ANALYSIS

¶9 The issue is whether the trial court erred in deciding the city's sign and height code restrictions did not violate Mr. Catsiff's free speech rights under the state and federal constitutions.

¶10 The superior court reviews the administrative record before the body or officer in the local jurisdiction authorized to make the final determination. *Citizens to Preserve Pioneer Park, LLC v. City of Mercer Island*, 106 Wn. App. 461, 470, 24 P.3d 1079 (2001). We stand in the same position as the superior court and review the record before the hearing examiner. *Thornton Creek Legal Def. Fund v. City of Seattle*, 113 Wn. App. 34, 47, 52 P.3d 522 (2002). We review the findings of fact under the substantial evidence standard and conclusions of law de novo. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000).

¶11 "First Amendment protections apply equally to statutes and local ordinances." *State v. Immelt*, 173 Wn.2d 1, 6, 267 P.3d 305 (2011). Article I, section 5 of the Washington Constitution also provides free speech protection. *Kitsap County v. Mattress Outlet*, 153 Wn.2d 506, 511, 104

P.3d 1280 (2005). The interpretation of constitutional provisions and legislative enactments, including municipal ordinances, presents a question of law that we review de novo. *City of Spokane v. Rothwell*, 166 Wn.2d 872, 876, 215 P.3d 162 (2009). Generally, we presume legislative enactments are constitutional. *State v. Bahl*, 164 Wn.2d 739, 753, 193 P.3d 678 (2008).

¶12 Initially, Mr. Catsiff suggests court decision inconsistencies between the principle that a party challenging an ordinance must demonstrate its unconstitutionality beyond a reasonable doubt and the principle that the government bears the burden of justifying restrictions on commercial speech by generally showing they are narrowly tailored to serve a substantial state interest. But in *Mattress Outlet*, for instance, our Supreme Court had no difficulty applying these principles. *Mattress Outlet*, 153 Wn.2d at 512. And, the *Immelt* court noted a party challenging an ordinance bears the burden of proving its unconstitutionality, and in the free speech context the State usually bears the burden of justifying a restriction on speech. *Immelt*, 173 Wn.2d at 3. We turn now to Mr. Catsiff's five contentions.

¶13 First, Mr. Catsiff incorrectly contends the octopus signs on his business were not commercial speech. Two nondefinitive formulations distinguish between commercial and noncommercial speech. The Supreme Court has said commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980). Another formulation is " 'speech proposing a commercial transaction.' " *Id.* at 562 (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56, 98 S. Ct. 1912, 56 L. Ed. 2d 444 (1978)). The octopus signs meet both formulations.

¶14 Mr. Catsiff named his toy store Inland Octopus. He designed a store logo depicting an octopus hiding behind inland buildings. He displayed images of his Inland Octopus logo and rainbows on his original storefront and in

advertising for his store. Mr. Catsiff admits he used an octopus on his storefront to convey "[t]hat it's a wonderful experience to come into my store and a wonderful place to buy toys." Ex. 15, at 29. Since the purpose of the sign was economic, the sign would be characterized as commercial speech under *Central Hudson*.

¶15 Second, because the city restricted commercial speech, we must decide whether, as Mr. Catsiff contends, the city met its burden of justifying the restrictions because they were narrowly tailored to protect the city's substantial interest in traffic safety and aesthetics. He argues a conflict exists between *Collier v. City of Tacoma*, 121 Wn.2d 737, 854 P.2d 1046 (1993) and *State v. Lotze*, 92 Wn.2d 52, 593 P.2d 811 (1979), over whether traffic safety and aesthetic values are compelling state interests.

¶16 The *Lotze* court held such interests are compelling in the context of regulating political signs visible from highways. *Lotze*, 92 Wn.2d at 59. But the *Collier* court held a city ordinance restricting the length of time political signs may be displayed was not adequately justified by the city's interests in traffic safety and aesthetics. In so holding, the court criticized *Lotze* and "depart[ed]" from it "to the extent it implie[d] that aesthetics and traffic safety are compelling interests justifying greater restrictions on political speech than on commercial speech." *Collier*, 121 Wn.2d at 756; *see also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 513 n.18, 101 S. Ct. 2882, 69 L. Ed. 2d 800 (1981) (criticizing and overruling its prior summary approval of *Lotze* for not giving adequate weight to the distinction between commercial and noncommercial speech and to the higher level of protection afforded the latter). As can be seen, the *Collier* court departed from *Lotze* solely as to the extent *Lotze* made aesthetics and traffic safety compelling interests justifying restrictions on political speech.

¶17 The criteria outlined by the court in *Collier* for evaluating regulations upon the noncommunicative aspects

of signs are virtually identical to the standards enunciated by the United States Supreme Court in *City of Ladue v. Gilleo*, 512 U.S. 43, 48, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994): while signs are a form of expression protected by the free speech clause, they pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. *Collier*, 121 Wn.2d at 752. Under *Collier* and *Gilleo*, restrictions upon the noncommunicative aspects of signs, i.e., the physical characteristics of signs, must be (1) content neutral, i.e., absent censorial purpose; (2) reasonable; and (3) supported by a legitimate regulatory interest. We address these restrictions in turn.

¶18 Regarding content neutrality, the *Collier* court explained that restrictions are content neutral if they do not regulate on the basis of viewpoint or classify speech in terms of subject matter. *Collier*, 121 Wn.2d at 748-53. Walla Walla's wall sign size and height restrictions do not limit what a business owner may say or depict in a wall sign. The requirements in the sign code regulate size and placement. The downtown design standards similarly solely state:

> Wall signs must be either painted upon the wall, mounted flat against the building, or erected against and parallel to the wall not extending out more than twelve inches therefrom. Wall signs shall be located no higher than thirty feet above grade . . . . The maximum combined area of all wall signs per street frontage shall not exceed twenty-five percent of the wall area. No combination of sign areas of any kind shall exceed one hundred fifty square feet per street frontage.

WWMC 20.178.110(B). Nothing in either provision regulates viewpoint or message. The size and height restrictions apply to all wall signs without classification and without reference to content. Thus, they are content neutral.

¶19 Next, regarding reasonableness, the *Mattress Outlet* court recognized that while "the means chosen need not be

the least restrictive means, the fit between the means chosen and the interests asserted must be reasonable." *Mattress Outlet*, 153 Wn.2d at 515. In *Prime Media v. City of Brentwood*, the court upheld a 120 square foot restriction, explaining, "[T]he question is not whether a municipality can 'explain' why a 120-square-foot limitation 'detract[s] more from the aesthetics of the City than signs with smaller sign face sizes'; it is whether the regulation is *'substantially broader* than necessary to protect the City's interest in eliminating visual clutter' and advancing traffic safety." 398 F.3d 814, 822 (6th Cir. 2005) (second alteration in original) (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 808, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984)). Additionally the United States Supreme Court has stated, "[T]he case law requires a reasonable 'fit between the legislature's ends and the means chosen to accomplish those ends.' " *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556, 121 S. Ct. 2404, 150 L. Ed. 2d 532 (2001) (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S. Ct. 3028, 106 L. Ed. 2d 388 (1989)).

¶20 The city satisfies the reasonableness test. The legislative history shows the city carefully considered its sign size and height restrictions. Its sign code was a product of its stated policy of "working with downtown businessmen to develop a workable sign code specifically for the downtown area." CP at 354. A building improvement guide was commissioned that recommended a "sign should not dominate; its shape and proportions should fit your building just as a window or door fits." CP at 578. It suggested that "[s]ome types of signs are *not* appropriate, including . . . oversized signs . . . applied over the upper facade." *Id.* The city used those considerations when choosing its sign size and height limitation in 1991, and it continues to rely on them. CP at 627. The city's consideration of such issues demonstrates reasonable legislative balancing based on local study and experience, which satisfies any calibration duty. *Prime Media*, 398 F.3d at 823-24.

¶21 Finally, regarding a legitimate regulatory interest, Mr. Catsiff argues his signs are entitled to greater protection under article I, section 5 of the Washington State Constitution and the city lacks a compelling interest for regulating sign size and height. The *Lotze* court described traffic safety and aesthetic values to be compelling state interests adequate to distinguish between commercial and noncommercial speech when regulating highway sign placement. *Lotze*, 92 Wn.2d at 58-59. The *Collier* court departed from *Lotze* by implying that "aesthetics and traffic safety are compelling interests justifying greater restrictions on political speech than commercial speech." *Collier*, 121 Wn.2d at 756. But, the court still concluded these interests are "sufficient" to justify regulations on the noncommunicative aspects of signs such as size. *Id.* at 761.

¶22 Here, the sign code purpose section states, "The purpose of this section is to accommodate and promote: sign placement consistent with the character and intent of the zoning district; proper sign maintenance; elimination of visual clutter; and creative and innovative sign design. To accomplish this purpose, the posting, displaying, erecting, use, and maintenance of signs shall occur in accordance with this Chapter." WWMC 20.204.010. Mr. Catsiff argues the purpose section is inadequate because it does not use the words "aesthetics" or "traffic safety." But, the section analogously discusses "visual clutter." CP at 104. The sign code manifests its interest in traffic safety in WWMC 20.204.050(A), where it explains it does not apply to a "sign which is not visible to motorists or pedestrians on any public right-of-way." CP at 63. Notably, the city has provided a legislative history showing the wall sign size and height restrictions were adopted as part of a comprehensive plan to address aesthetics and traffic control. Thus, the city has demonstrated a legitimate regulatory interest in adopting its sign restriction ordinances.

¶23 In sum, the city shows its restrictions were content neutral, reasonable, and supported by a legitimate regula-

tory interest, satisfying the *Collier* restrictions. We hold the city has met its burden of showing the ordinances are lawfully justified.

¶24 Third, Mr. Catsiff contends the ordinances are unconstitutionally vague. A party challenging the constitutionality of an ordinance has the burden of proving it is unconstitutionally vague beyond a reasonable doubt. *City of Seattle v. Huff*, 111 Wn.2d 923, 928, 767 P.2d 572 (1989). When an enactment is challenged on vagueness, we examine whether adequate notice is given to citizens and adequate standards prevent arbitrary enforcement. *Id.* at 928-29. Mr. Catsiff argues the term "sign" is itself vague. The restrictions, however, apply to "wall signs." CP at 57. The sign code defines a "wall sign" as "any sign attached to or painted directly on the wall, or erected against and parallel to the wall of a building, not extending more than twelve inches from the wall." WWMC 20.204.020(A)(37). The downtown design standards similarly provide the size and height restrictions apply to "wall signs" painted upon, mounted flat upon, or erected against and parallel to a building. WWMC 20.178.110(B). Each, in turn, defines a "sign" as "any device, structure, fixture (including the supporting structure) or any other surface that identifies, advertises and/or promotes an activity, product, service, place, business, political or social point of view, or any other thing." WWMC 20.204.020(A)(27); WWMC 20.06.030.

¶25 When read together, no danger exists that a citizen could mistake other surfaces, such as T-shirts or hats, as being regulated by the city's size and height requirements; the restrictions are limited to wall surfaces, surfaces attached to walls, and surfaces erected against and parallel to walls. Accordingly, we hold the ordinances provide adequate notice regarding the conduct prohibited and, therefore, are not vague.

¶26 Fourth, Mr. Catsiff contends the wall sign size and height restrictions are constitutionally overbroad because they reach noncommercial speech as well as com-

mercial speech. The Supreme Court recognizes the overbreadth doctrine is "strong medicine" that should be employed sparingly and solely as a last resort. *State v. Halstien*, 122 Wn.2d 109, 122, 857 P.2d 270 (2003) (citing *O'Day v. King County*, 109 Wn.2d 796, 804, 749 P.2d 142 (1988)). The first step in an overbreadth analysis is to determine if a statute reaches constitutionally protected speech or expressive conduct. *Id.* at 122. "If the answer is yes, then the court must examine whether the statute prohibits a 'real and substantial' amount of protected conduct in contrast to the statute's plainly legitimate sweep." *Id.* at 123 (quoting *City of Tacoma v. Luvene*, 118 Wn.2d 826, 841, 827 P.2d 1374 (1992)).

¶27 As discussed above, the ordinances regulate advertising by downtown businesses to protect aesthetics and promote traffic safety. Thus, the ordinances do not reach constitutionally protected speech. Accordingly, Mr. Catsiff does not meet the first task in an overbreadth analysis. In short, his claim fails.

¶28 Fifth, Mr. Catsiff contends the sign-permit requirement is an invidious prior restraint. Initially, the city argues Mr. Catsiff cannot bring a prior restraint claim in this proceeding because he did not first raise this issue in an administrative appeal. The city issued a business permit on March 29, 2010 for relocation of his store. Mr. Catsiff's business permit contained a condition he "[o]btain a Sign permit prior to construction or installation of any exterior signage." CP at 647. The WWMC provided him with an administrative appeal option if he contested this procedure. WWMC 20.18.070. " 'If . . . an administrative proceeding might leave no remnant of the constitutional question, the administrative remedy plainly should be pursued.' " *Ackerley Commc'ns, Inc. v. City of Seattle*, 92 Wn.2d 905, 909, 602 P.2d 1177 (1979) (alteration in original) (quoting *Pub. Util. Comm'n v. United States*, 355 U.S. 534, 539-40, 78 S. Ct. 446, 2 L. Ed. 2d 470 (1958)). Because Mr. Catsiff did not exhaust his administrative remedies, this issue is not properly before this court.

¶29 Even so, because the trial court concluded the restrictions did not impose an unlawful prior restraint, we address prior restraint. "Prior restraints are 'official restrictions imposed upon speech or other forms of expression in advance of actual publication.'" *JJR Inc. v. City of Seattle*, 126 Wn.2d 1, 6, 891 P.2d 720 (1995) (quoting *City of Seattle v. Bittner*, 81 Wn.2d 747, 756, 505 P.2d 126 (1973)). While under the First Amendment "a system of prior restraint is not presumptively unconstitutional," a prior restraint is unconstitutional per se under article I, section 5. *Id.* at 6 & n.4.

¶30 Not every speech regulation is a prior restraint. Regulations that do not ban expression but instead impose valid temporal, geographic, or manner of speech limitations are analyzed as time, place, and manner restrictions. *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 126, 937 P.2d 154 (1997). For the reasons discussed above, the city's sign size and placement restrictions were reasonable and based on legitimate government interests. Accordingly, Mr. Catsiff fails to show a constitutionally invalid prior restraint.

¶31 Given the above, we do not reach Mr. Catsiff's attorney fee request for this appeal under 42 U.S.C. § 1983 because he does not substantially prevail.

¶32 Affirmed.

SWEENEY and KULIK, JJ., concur.

Reconsideration denied May 14, 2012.

Review denied at 175 Wn.2d 1016 (2012).