[No. 56574-5-I.   Division One.   November 6, 2006.]

THE STATE OF WASHINGTON, *on the relation of The Public Disclosure Commission, Respondent*, v. PERMANENT OFFENSE ET AL., *Defendants*, SUZANNE KARR, *Appellant*.

*Suzanne Karr*, pro se.

*Robert M. McKenna, Attorney General,* and *H. Bruce Marvin, Assistant,* for respondent.

¶1  Cox, J. — Suzanne Karr challenges the decision of the Snohomish County Superior Court determining that she violated the Washington public disclosure act (PDA), chapter 42.17 RCW. We hold that the portions of the PDA that she challenges do not unconstitutionally infringe on her First Amendment rights. We also hold that the superior court had subject matter jurisdiction to decide this case, that there was no violation of Karr's right to due process, and that the findings of fact and conclusions of law were proper. We affirm.[1]

¶2  At the end of 1999, Suzanne Karr and Tim Eyman formed a political action committee (PAC) called Permanent Offense (PO-PAC). Karr was PO-PAC's treasurer. Eyman could not afford to work for PO-PAC without compensation, so he and Karr agreed to a plan to compensate him through the use of another corporation. Eyman did not want the public to know that he would profit from his campaign work. So, he and Karr formed a for-profit corporation, Permanent Offense, Inc. (PO-Inc.), which was to be the nominal entity providing campaign services to PO-PAC. Thus, although Eyman was to receive compensation from PO-Inc., he and Karr did not disclose this fact to anyone.

---

[1] After the conclusion of briefing, the State filed a statement of additional authorities directed to Karr's alleged waiver of her First Amendment argument. Karr objected. Because RAP 10.8 expressly provides for the filing of such a statement at any time prior to the court's decision on the merits, we have considered the authorities in the statement.

¶3 Pursuant to their arrangement, Eyman determined his desired salary amount, and Karr created a billing scheme to meet his request. She determined reasonable monthly charges and, as PO-Inc.'s secretary, created invoices and began charging PO-PAC for those services on a monthly basis. As PO-PAC's treasurer, she made monthly payments to PO-Inc. and filed reports with the Public Disclosure Commission (PDC or commission), as required by the PDA. None of the reports disclosed that Eyman was providing services or being compensated for those services.

¶4 Based on information supplied to it, the PDC investigated claimed violations of the PDA against Karr, Eyman, PO-PAC, and others. After the investigation, the commission determined that Eyman, Karr, and PO-PAC apparently violated the PDA. The PDC referred the matter to the attorney general for further action.

¶5 Thereafter, the State commenced this action against PO-PAC, Eyman, and Karr. All defendants except Karr settled. She proceeded to a bench trial. Following an oral ruling in favor of the State, Karr moved to dismiss the action on First Amendment grounds. After additional briefing and oral argument, the court denied that motion and entered a judgment for penalties and attorney fees against her.

¶6 Karr appeals.

## FIRST AMENDMENT

¶7 Karr argues that the statutes she was found to have violated unconstitutionally infringe on the First Amendment. We hold that these statutes are not unconstitutional.

¶8 We first address a threshold issue that the State raises. It argues that Karr waived her First Amendment claim by not raising it as an affirmative defense in her answer. Rather, she waited to move to dismiss until after the court's oral ruling against her on the claims litigated at trial.

■ ¶9 The trial court has considerable discretion in determining whether to consider parties' untimely arguments.[2] Here, the parties were given additional time to brief the First Amendment question. Thereafter, they presented extensive oral argument to the court. No one convincingly argues that there was any need for additional evidence. The State has failed either to show that it was prejudiced by the court's decision to consider the new argument or that the court otherwise abused its discretion by considering the matter. Thus, we consider the merits of Karr's First Amendment claim.

■■ ¶10 Laws that burden the First Amendment right to political speech are inherently suspect and subject to " 'exacting scrutiny.' "[3] The State bears the burden of establishing that such a law furthers a substantial governmental interest and is not outweighed by the burden on political speech.[4] Here, the State concedes that the PDA[5] burdens political speech to some extent, so that exacting scrutiny is the proper test to apply.

■ ¶11 The issues in this case were recently addressed in *California Pro-Life Council, Inc. v. Getman.*[6] There, the Ninth Circuit addressed the constitutionality of a California campaign finance disclosure law similar to Washington's. That law requires political committees to disclose the source and amount of campaign contributions and expenditures related to voter-decided propositions. Relying on

---

[2] *See Vaughn v. Kwan-Bong Chung,* 119 Wn.2d 273, 280, 830 P.2d 668 (1992) ("[C]ivil rules contain a preference for deciding cases on their merits rather than on procedural technicalities.").

[3] *Wash. Initiatives Now v. Rippie,* 213 F.3d 1132, 1138 (9th Cir. 2000) (quoting *Meyer v. Grant,* 486 U.S. 414, 419, 108 S. Ct. 1886, 100 L. Ed. 2d 425 (1988)).

[4] *Rippie,* 213 F.3d at 1138-39. Some cases have likened "exacting scrutiny" to strict scrutiny. *E.g., Cal. Pro-Life Council, Inc. v. Getman,* 328 F.3d 1088, 1101 (9th Cir. 2003). However, the court in *Getman* applied strict scrutiny specifically because it analyzed the law's burden on an organization whose major purpose was *not* campaign advocacy and explained that the reporting and disclosure requirements are less burdensome on PACs, justifying intermediate scrutiny in those cases. *Id.* at n.16.

[5] RCW 42.17.010.

[6] 328 F.3d 1088 (9th Cir. 2003).

language in numerous Supreme Court and Ninth Circuit opinions regarding disclosure laws applied to ballot-measure advocacy, as opposed to candidate advocacy, the court declined to find the law unconstitutional per se.[7] It remanded the case to the federal district court to determine whether the law met strict scrutiny. In remanding, the court outlined the pertinent analysis for the lower court to apply.

¶12 The appellate court reasoned that California could have a compelling interest in providing voters with information about "who is doing the talking" about ballot measures.[8] Given the myriad of messages voters have to sift through when considering an issue and the millions of dollars that interest groups pour into those messages, voters may well need this information in order to properly evaluate potential legislation, just as members of Congress may require lobbyists to disclose financial sources.[9]

¶13 On remand, the district court held that the statute satisfied strict scrutiny.[10] It held that California has a compelling interest in informing voters about expenditures and contributions, especially given the "staggering sums" spent on ballot measures, the large number of ballot measures voters must evaluate, and evidence that voters heavily rely upon this information in making their decisions.[11] In addition, it held that the State has a compelling interest in maintaining the integrity of the legislative process by preventing the concealment of sources' identities that may funnel money through other organizations.[12] Finally, the court determined that California's disclosure requirements

---

[7] *Id.* at 1100-02.

[8] *Id.* at 1105.

[9] *Id.* at 1106.

[10] Mem. & Order of the U.S. District Court, *Cal. Pro-Life Council, Inc. v. Getman*, No. Civ. S-00-1698 (E.D. Cal. Feb. 22, 2005), *available at* http://www.electionlawblog.org/archives/getman.pdf (last visited Nov. 2006).

[11] Mem. & Order, *Getman*, at 18.

[12] *Id.* at 19.

are narrowly tailored to serve these interests because they require timely and organized reports of the financial information voters need and are not overly burdensome.[13]

¶14 Similar reasoning applies here. Washington State has a substantial interest in providing the electorate with valuable information about who is promoting ballot measures and why they are doing so. In short, the voters need to know "who is doing the talking" about ballot measures. Moreover, it is particularly important in these situations that voters know whether other influences—particularly money—are affecting those who are otherwise known as grass-roots organizers. Finally, the State has a substantial interest in promoting integrity and preventing concealment that could harm the public and mislead voters. This case aptly illustrates this point.

¶15 The whole purpose of the use of a corporate entity in this case was to conceal Eyman's receipt of compensation for what otherwise appeared to be grass-roots effort. As the trial court correctly concluded, there is nothing inherently unlawful about forming a corporation to provide consulting services. Rather, it is the use of the corporate form for the improper purpose of concealment that is the problem.

¶16 The PDA declares as its policy:

> That, mindful of the right of individuals to privacy and of the desirability of the efficient administration of government, full access to information concerning the conduct of government on every level must be assured as a fundamental and necessary precondition to the sound governance of a free society.[14]

As the trial court concluded, the interest in educating the public about crucial voter-enacted initiatives is important.[15] The PDA furthers these interests by providing the needed information to the voters. Indeed,

> there is no available means to achieve the state's informational interest other than requiring organizations making

---

[13] *Id.* at *28-31.

[14] RCW 42.17.010(11).

[15] *See also Fritz v. Gorton*, 83 Wn.2d 275, 309, 517 P.2d 911 (1974) ("The electorate, we believe, has the right to know of the sources and magnitude of financial and persuasional influences upon government.").

expenditures to disclose that information in a useful and timely fashion.[16]

¶17 Significantly, the PDA is more narrowly tailored as it applies to PO-PAC than California's law. Unlike the multipurpose organization in *Getman*, PO-PAC only engages in express political advocacy, thus avoiding problems of overbreadth that might otherwise exist.[17] Finally, while the disclosure requirements of the PDA do burden political speech, after-the-fact financial reporting is far less burdensome on speech than the outright prohibition of speech by way of spending limitations.[18] It is also less burdensome than requiring self-identification on the face of election-related writings.[19]

¶18 Karr compares this case with the facts in *Rippie*. She relies heavily on the fact that other portions of the PDA were held to be unconstitutional. But the mere proximity of the statutes she now challenges to those invalidated in *Rippie* is insufficient to support her argument.

¶19 In *Rippie*, the Ninth Circuit struck down a subsection of the PDA that required PACs to disclose the names, addresses, and amounts of money paid to persons who collect signatures for initiative petitions.[20] Applying "exacting scrutiny," the court held that the State's interest in combating fraud by collecting information about paid circu-

---

[16] Mem. & Order, *Getman*, at 33.

[17] *See id.* at 30-40 (discussing the "major purpose test" of *Buckley v. Valeo*, 424 U.S. 1, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)).

[18] *See Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 299, 102 S. Ct. 434, 70 L. Ed. 2d 492 (1981) (noting that the governmental interest of identification can be realized through disclosure requirements rather than spending limits).

[19] *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 355, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995) ("[E]ven though money may 'talk,' its speech is less specific, less personal, and less provocative than a handbill.").

[20] *Rippie*, 213 F.3d at 1134.

lators did not outweigh the circulators' right to anonymity in political speech.[21] In addition, the court explained that the provision did not further the State's interests in either combating fraud or educating voters through campaign finance disclosure.[22]

¶20 *Rippie* is easily distinguishable from this case. The State's purpose in identifying paid circulators was primarily to prevent fraud and was not the same as the information interests served by financial disclosures. In *Rippie*, the court rejected the State's second asserted interest in providing information to voters, specifically relying upon the fact that such an interest is better served by the financial disclosure requirements at issue in this case.[23] Because the State has a substantial interest in providing information to voters that is closely related to the disclosure requirements, we reject Karr's arguments and conclude that the law as applied to her is constitutional.

## SUBJECT MATTER JURISDICTION

¶21 Karr asserts that the trial court lacked jurisdiction to hear her case because the PDC had priority of jurisdiction. Because a plain reading of the governing statutes shows otherwise, we disagree.

██ ██ ¶22 We review the superior court's exercise of jurisdiction de novo.[24] Contrary to Karr's claim, the commission did not adjudicate her claim. Rather, it clearly acted within the discretion granted by the PDA in referring this case to the attorney general after its investigation.

¶23 RCW 42.17.395(1) provides that the PDC:

---

[21] *Id.* at 1137-39.

[22] *Id.* at 1139.

[23] *Id.*

[24] *Young v. Clark*, 149 Wn.2d 130, 132, 65 P.3d 1192 (2003).

*may* (a) determine whether an actual violation of this chapter has occurred; and (b) issue and enforce an appropriate order following such determination.[25]

RCW 42.17.395(3) gives the commission another option:

In lieu of holding a hearing or issuing an order under this section, the commission may refer the matter to the attorney general or other enforcement agency as provided in RCW 42.17.360.

Among other things, section 360 allows the agency to "investigate and report *apparent violations* . . . to the appropriate law enforcement authorities."[26] Finally, section 400, entitled "Enforcement," provides in part that the attorney general "may bring civil actions in the name of the state for any appropriate civil remedy."[27]

¶24 The record establishes that the PDC investigated Karr's case, found "apparent" violations of the law, and referred the case to the attorney general for prosecution in superior court. These actions were entirely consistent with the PDA and within the commission's discretion.

¶25 Karr argues that the commission *did* issue an order under section 395, so referral to the attorney general was inappropriate. However, an "order under this section" refers to the order discussed in section 395(1)—an order finding that a person committed an "actual violation."[28] Here, the PDC concluded that Karr committed "apparent" violations and therefore referred the case pursuant to section 395, rather than holding a hearing to determine whether she committed "actual" violations. This was a proper course of action according to the statute.

---

[25] (Emphasis added.)

[26] RCW 42.17.360(5) (emphasis added).

[27] RCW 42.17.400(1).

[28] RCW 42.17.395(1).

## SUFFICIENCY OF THE EVIDENCE

¶26 Karr argues that the trial court misapplied the law to the facts of her case by finding a violation due to a concealment of the identity of a recipient of expenditures. She also argues that the evidence before the trial court did not establish that she violated the reporting requirements. We reject her arguments and conclude that there was sufficient evidence to support the trial court's conclusions.

■ ¶27 Our review is limited to determining whether there is sufficient evidence in the record "to persuade a fair-minded, rational person" that Karr violated RCW 42.17.080, 42.17.090, and 42.17.120.[29] We do not substitute our judgment for that of the trier of fact.[30] We review issues of law de novo.[31]

### *Concealment*

■ ¶28 Karr challenges the trial court's application of RCW 42.17.120, arguing that she never concealed the source of a contribution but only the ultimate recipient of expenditures, Mr. Eyman. Her interpretation of the statute is incorrect, and substantial evidence existed to find her in violation of the provision.

¶29 RCW 42.17.120 states in part,

No contribution shall be made and no expenditure shall be incurred, directly or indirectly, ... in such a manner as to conceal the identity of the source of the contribution *or in any other manner so as to effect concealment.*[32]

The provisions of the PDA are to be "liberally construed to promote complete disclosure of all information respecting the financing of political campaigns and lobbying."[33]

---

[29] *Hilltop Terrace Homeowner's Ass'n v. Island County*, 126 Wn.2d 22, 34, 891 P.2d 29 (1995).

[30] *Id.*

[31] *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 114, 937 P.2d 154 (1997).

[32] (Emphasis added.)

[33] RCW 42.17.010(11).

¶30 It is apparent that Karr's argument ignores the last phrase of RCW 42.17.120—"or in any other manner so as to effect concealment." The trial court did not commit legal error in interpreting this broad language, and there is ample evidence in the record to support its conclusion that Karr acted in "any" manner "so as to effect concealment," especially considering the stated policy of interpreting the statute liberally.

¶31 Specifically, Karr's testimony at trial and e-mail communications between Karr and Eyman support the conclusion that Karr and Eyman formed PO-Inc. for the primary purpose of concealing the fact that PO-PAC paid Eyman a salary for his work on the campaigns. In addition, Karr's testimony, e-mails between Karr and Eyman, and testimony of Kurt Young, the PDC compliance officer on the case, tend to establish that the amounts PO-Inc. charged to PO-PAC were not related to actual services rendered, but were sham numbers based upon the ultimate goal of providing Eyman with a particular dollar amount by the end of the year. The trial court concluded that although using a corporate structure to provide services to the PAC was not itself a violation of the law, the evidence of her specific intent to conceal, and the actions she undertook to implement her scheme, established that Karr acted in a deliberate manner "so as to effect concealment" of the recipient of PO-PAC's expenditures. This conclusion was reasonable based on the evidence.

### Reporting Violations

¶32 Karr challenges the trial court's determination that she violated RCW 42.17.080 and 42.17.090. Her arguments are without merit.

¶33 RCW 42.17.080 requires that the treasurer of any PAC shall file certain reports with the PDC on a monthly basis. Specifically, the treasurer shall file a report both 21 and 7 days before the relevant election, on the 10th of the month following the election, and on the 10th of each month in which an expenditure is made or contribution received.

¶34 RCW 42.17.090 specifies that each such report shall contain, among other things: (1) the name of each person who has made a contribution or loan to the PAC during the month, and the dollar amount and date of each contribution or loan made; (2) the name of each person to which an expenditure was made by the PAC during the month, and the dollar amount and date of each expenditure; and (3) the name of each person to whom the PAC owes a debt, obligation, or other liability of more than $250, and the amount owed.[34] A "contribution" includes "anything of value, including personal and professional services for less than full consideration."[35] "Contribution" does not include "[t]he rendering of personal services of the sort commonly performed by volunteer campaign workers."[36] Further,

> [c]ontributions other than money or its equivalent are deemed to have a monetary value equivalent to the fair market value of the contribution. Services or property or rights furnished at less than their fair market value for the purpose of assisting any candidate or political committee are deemed a contribution. Such a contribution must be reported as an in-kind contribution at its fair market value and counts towards any applicable contribution limit of the provider.[37]

¶35 The trial judge reasonably concluded that Karr billed PO-PAC for services rendered by PO-Inc. on a monthly basis. Karr testified to the commission that as secretary of PO-Inc., she charged PO-PAC $1,800 per month for accounting and database services, and for fundraising and management services she charged 8 percent of the committee's expenditures for the month and 25 percent of the contributions received by the committee for the month. She implemented this billing scheme in early 2000 and applied it regularly throughout the year, with some errors and inconsistencies. From this, it was reason-

---

[34] RCW 42.17.090(1)(b), (c), (e), (f), (h). There are some de minimis exceptions to these requirements, such as contributions of less than $25.

[35] RCW 42.17.020(15)(a)(i).

[36] RCW 42.17.020(15)(b)(vi).

[37] RCW 42.17.020(15)(c).

able to conclude that PO-PAC incurred monetary obligations for PO-Inc.'s services on a monthly basis.

¶36 Evidence in the record establishes that Karr failed to report debts or obligations for May and June of 2000. As treasurer of PO-PAC, Karr filed the so-called "C-4" reports as required by the PDA for February, March, and April of 2000, showing that PO-PAC paid PO-Inc. each month based on the billing scheme described above. The reports she filed for May and June of 2000 did not report any payments made or obligations owed to PO-Inc. Then, at the end of July, she filed a C-4 report on behalf of PO-PAC showing expenditures to PO-Inc. for May through July. This report was somewhat consistent with her stated billing practice, including a charge of $5,400 for accounting and database management for May through July (3 times $1,800), plus an additional charge for fund raising and management that was not consistent with the 25 percent and 8 percent figures she usually used. Even though the July C-4 reported expenditures for services rendered during May and June, the trial court correctly concluded that she violated RCW 42-.17.080 and 42.17.090 by failing to list PO-PAC's obligation to pay for the services that it received during May and June in the reports she filed for those months.[38] In short, she filed C-4 reports for May and June but failed to disclose in those reports that PO-PAC received services during those months, creating an obligation to later pay for those services.

¶37 Evidence in the record also establishes that Karr failed to report contributions in August, September, October, and November of 2000. In the C-4 reports that she filed for those months, she failed to report any contribution received from PO-Inc., including professional services. However, her testimony establishes that, as secretary of PO-Inc., she continued to provide accounting and database services to PO-PAC. Eyman also continued to provide fund raising and management services during each of those

---

[38] *See* RCW 42.17.090(1)(h) (requiring that each report include the amount of any debt or obligation owed if it exceeds $250).

months. This should have been reported either as an in-kind contribution of services (in excess of $25), or as an outstanding debt or obligation (in excess of $250). Because Karr did not charge or report anything for the services received during those months, the trial court correctly concluded that she violated RCW 42.17.080 and 42.17.090.

¶38 Karr testified that she did not intend to bill for Eyman's services on a monthly basis, but rather to bill PO-PAC a flat fee for his services, which she spread out over a period of several months. She simply stopped billing on a monthly basis once that flat fee had been satisfied. However, the trial court determined that her testimony was not credible, and we cannot disturb that credibility determination on appeal. As the trial judge found, there was evidence in the record to support the contrary conclusion—she billed for services on a monthly basis.

¶39 Karr also argues that there is insufficient evidence in the record for the trial court to determine precisely the fair market value of the services provided by PO-Inc. during August through November, and that without such a finding, the trial court could not have concluded that she failed to report that number. However, there is nothing in the law that requires such a factual finding before a violation can be found. As discussed above, there was evidence in the record to prove that the fair market value of the services provided by PO-Inc. was what Karr and Eyman agreed—$1,800 a month for accounting and database services, and 8 percent of the committee's expenditures and 25 percent of the contributions received for fund raising and management services. In short, the record clearly establishes that the fair market value of the services PO-PAC received is more than $25, the de minimis exception for reporting contributions.[39] The trial court's decisions were supported by substantial evidence in the record.

---

[39] RCW 42.17.090(1)(b).

## DUE PROCESS

¶40 Karr claims, without citation to relevant authority, that the commission violated the Administrative Procedure Act (APA)[40] and deprived her of due process during its investigation of the claim against her. Arguing that the APA requires notice, a hearing, confrontation of witnesses, and an impartial decision maker, Karr asserts that the commission did not properly adjudicate her claim by following these procedures. Specifically, she points out that unlike the other parties being investigated by the PDC, she was not allowed to attend the depositions of other witnesses at the agency level. We hold that Karr was afforded all due process to which she was entitled.

¶41 Alleged violations of due process, as well as the constitutional entitlement to an administrative hearing, are questions of law that we review de novo.[41] As is true with most administrative procedure acts, the Washington APA provides for only minimum procedural due process in the case of adjudication.[42] At the very least, procedural due process requires the opportunity to be heard at a meaningful time and in a meaningful manner before being deprived of a property interest.[43] A full-blown trial in a court of law provides far more than minimum procedural due process.[44]

¶42 Karr received a full trial on the merits of the State's case against her, including the right to call and cross-examine witnesses and produce evidence, participation in civil discovery, and a decision by a neutral judge. She does

---

[40] Ch. 34.05 RCW.

[41] *See State v. Warner*, 125 Wn.2d 876, 882-83, 889 P.2d 479 (1995); *Conway v. Dep't of Soc. & Health Servs.*, 131 Wn. App. 406, 418, 120 P.3d 130 (2005).

[42] *See* William R. Andersen, *The 1988 Washington Administrative Procedure Act—An Introduction*, 64 WASH. L. REV. 781, 809 (1989).

[43] *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); *accord In re Welfare of Petrie*, 40 Wn.2d 809, 812, 246 P.2d 465 (1952).

[44] *See Goldberg v. Kelly*, 397 U.S. 254, 266, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970) (explaining that due process does not require a "judicial or quasi-judicial trial").

not argue that the superior court violated her due process rights in any way.

¶43 Even if she was entitled to an administrative hearing, and referral to the attorney general was improper, any prejudice was cured by her trial on the merits in superior court.[45] Her argument that proper procedure was not followed in this case is entirely without merit.

## OTHER MATTERS

■■■ ¶44 Karr raises two issues for the first time in her reply brief. First, she "does not concede" the issue of personal jurisdiction. Second, she alleges that the PDC violated the appearance of fairness doctrine. However, it is inappropriate to raise an issue for the first time in a reply brief,[46] and we do not consider these arguments.

## ATTORNEY FEES AND COSTS

¶45 The State and Karr both seek attorney fees and costs for this appeal. Because the State has prevailed on appeal and there is a statutory basis for an award of fees to it, we award fees to the State, subject to its compliance with RAP 18.1(d). Correspondingly, Karr is not entitled to fees or costs.

■■■■■■ ¶46 In Washington, a party may recover attorney fees only when they are authorized by a private agreement, statute, or recognized ground of equity.[47] RCW 42.17-.400(5) states, "In any action brought under this section, the court may award to the state all costs of investigation and trial, including a reasonable attorney's fee to be fixed by the

---

[45] *See Gnecchi v. State*, 58 Wn.2d 467, 470-71, 364 P.2d 225 (1961) (" '[A]s a general rule, a law which provides that the decision of an administrative board shall be subject to appeal to the courts, where a full [sic] *de novo* hearing is afforded, satisfies the requirements of due process.' " (second alteration in original) (quoting *In re Sterilization of Hendrickson*, 12 Wn.2d 600, 605, 123 P.2d 322 (1942))).

[46] RAP 10.3(c); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

[47] *Mellor v. Chamberlin*, 100 Wn.2d 643, 649, 673 P.2d 610 (1983).

court." Under this section, an award of fees to a prevailing party at trial authorizes fees on appeal.[48] The State prevailed at trial as well as in this appeal. Therefore, the trial court did not err in granting it costs and fees, and the State is also entitled to costs and attorney fees for its appeal, subject to its compliance with RAP 18.1(d).

¶47 Karr seeks costs and attorney fees pursuant to RCW 42.17.400, 4.84.185, 4.84.010, 4.84.350, and CR 11. RCW 42-.17.400(5), 4.84.010, and 4.84.350(1) each allows a court to award attorney fees to a prevailing party. Because Karr is not a prevailing party, she is not entitled to attorney fees under these provisions.

¶48 RCW 4.84.185 and CR 11(a) provide that a court may award costs and attorney fees to a prevailing party if the claim against that person was frivolous, not grounded in fact or law, or advanced without good cause or proper purpose. None of these factors applies to this case. Therefore, she is not entitled to costs and fees under these provisions.

¶49 We affirm the judgment.

APPELWICK, C.J., and SCHINDLER, J., concur.

Reconsideration denied December 20, 2006.

Review denied at 162 Wn.2d 1003 (2007).

---

[48] *State ex rel. Pub. Disclosure Comm'n v. Wash. Educ. Ass'n*, 117 Wn. App. 625, 641, 71 P.3d 244 (2003).