**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                              Respondent,<br><br>       v.<br><br>GROCERY MANUFACTURERS ASSOCIATION,<br><br>                              Appellant.<br><br>─────────────────────────<br><br>GROCERY MANUFACTURERS ASSOCIATION,<br><br>                              Appellant,<br><br>       v.<br><br>STATE OF WASHINGTON,<br><br>                              Respondent. | No. 49768-9-II<br>Consol. w/ 50188-1-II<br><br><br>PUBLISHED OPINION |

MAXA, C.J. – The Grocery Manufacturer's Association (GMA) appeals the trial court's imposition of an $18 million civil penalty for violations of the Fair Campaign Practices Act (FCPA), chapter 42.17A RCW, relating to a 2013 Washington ballot initiative, Initiative 522. I-522, which did not pass, would have required all packaged food products to identify ingredients containing genetically modified organisms (GMOs).

GMA created a segregated account funded by contributions from some of its member companies to address GMO labeling issues, including opposing I-522. GMA made expenditures of approximately $11 million from the account to oppose I-522. However, GMA did not register

as a political committee with the Public Disclosure Commission (PDC) and did not comply with reporting and disclosure requirements for political committees. Specifically, GMA failed to disclose the companies contributing to the account.

The trial court ruled on summary judgment that GMA became a "political committee" as defined in former RCW 42.17A.005(37)[1] when it created the account. The court also ruled that GMA violated various FCPA reporting and disclosure requirements for political committees and violated RCW 42.17A.435 by concealing the source of the contributions it made to oppose I-522. After a bench trial on penalties, the trial court imposed a civil penalty of $6 million for the FCPA violations and trebled that amount as punitive damages under RCW 42.17A.765(5) based on a finding that GMA's violation of the law was intentional.

We hold that (1) the trial court did not err in ruling on summary judgment that GMA became a political committee as defined in RCW 42.17A.005(37) because there was no genuine issue of material fact that GMA had an expectation of receiving contributions in opposition to I-522; (2) the FCPA's reporting and disclosure requirements do not violate the First Amendment as applied to GMA because they are substantially related to an important government interest in providing information to voters; (3) neither the definition of "political committee" nor RCW 42.17.435, the statute prohibiting concealment of a contribution source, are unconstitutionally vague as applied to GMA; and (4) the trial court did not err at trial in excluding evidence of GMA's communications and cooperation with the PDC. However, we hold that the trial court

---

[1] The legislature amended RCW 42.17A.005 in 2018, and recodified .005(37) as .005(40). Laws of 2018, ch. 304, § 2. We refer to the former numbering.

erred in ruling that GMA did not need to subjectively intend to violate the law in order to be subject to treble damages under RCW 42.17A.765(5).[2]

Accordingly, we affirm the trial court's order granting summary judgment in favor of the State, reverse the trial court's imposition of treble damages against GMA, and remand for further proceedings for the trial court to determine whether GMA is subject to treble damages under the proper legal standard.

FACTS

GMA is a nationwide trade association that represents hundreds of food, beverage, and consumer product companies. GMA is governed by a board of directors, comprised primarily of corporate officers from GMA member companies.

GMA is interested in promoting reasonable and national food labeling requirements. GMA became involved in the debate over whether food labels should identify ingredients derived from GMOs. On behalf of its members, GMA opposed state and local GMO-labeling efforts.

*Summary Judgment Facts*

In 2012, GMA actively opposed a ballot proposition in California, Proposition 37. The ballot proposition would have required producers of packaged food products to label products containing GMOs. Because of GMA's opposition to Proposition 37, some of its member companies received negative public attention, including boycotts and threats.

Later in 2012, GMA learned about a similar proposed ballot initiative in Washington, I-522. GMA intended to oppose I-522 and any other state-level food labeling mandates. I-522

---

[2] GMA also argues that the total civil penalty of $18 million was an excessive fine under the Eighth Amendment to the United States Constitution. Because we reverse the imposition of treble damages, we do not address this issue.

was submitted to the legislature with public signatures on January 3, 2013. GMA conducted polling in Washington to determine if a campaign to oppose I-522 would be successful. And GMA staff began planning for an aggressive campaign in Washington, assuming that polling would support such a plan.

At a January 2013 board meeting, GMA staff and board members discussed a plan to oppose GMO labeling initiatives, including I-522, while avoiding state financial disclosure filing requirements. The board preferred that GMA, rather than individual member companies, be identified as the source of political contributions.

GMA staff briefed the board on a proposed plan to provide financial support for GMO-related activities through an account held by GMA, which staff called the Defense of Brands (DOB) account. The goal was to have a strategic account that provided funding for projects to accomplish the objective of not allowing mandatory GMO labeling. Opposing state ballot measures was one of several projects the DOB account would fund. Other projects included federal advocacy, consumer research, and state advocacy. Under the plan, GMA would invoice member companies for special contributions, which GMA would place in the DOB account and then spend on campaigns under its own name.

Although GMA intended to oppose ballot measures in any state, at the time the possibility of creating the DOB account was discussed the only potential ballot initiative GMA planned to oppose was I-522. GMA's proposed budget for opposing GMO labeling initiatives in 2013 allocated $10 million to defeating I-522. The board understood that a significant portion of the funds collected for the DOB account would be used to oppose I-522.

The board approved the plan and created the DOB account on February 28, 2013. Although I-522 had not yet officially qualified for the ballot, GMA sent its first invoice for the

DOB account to member companies on March 15. The invoice was accompanied by an update on the status of the campaign to oppose I-522.

A total of 34 GMA member companies ultimately contributed to the DOB account. The three companies contributing significantly more money than the others were PepsiCo, Inc., Nestle USA, Inc., and The Coca Cola Company. Some members declined to participate in funding the account.

GMA made its first contribution to the "No on 522" campaign from the DOB account on May 8. GMA did not make the decision to provide significant financial support to oppose I-522 until then. GMA subsequently sent additional invoices to the DOB account contributors. GMA provided member companies with regular updates on the campaign to oppose I-522, and GMA members were informed when their contributions were transferred from the DOB account to the "No on 522" campaign. GMA ultimately contributed over $11 million from the DOB account to the "No on 522" campaign.

GMA did not register with the PDC as a political committee when it established the DOB account. GMA did not register as a political committee or file any required political committee reports until it received a violation notice from the PDC in October 2013.

*Litigation and Summary Judgment*

The State sued GMA for failing to register as a political committee, failing to report financial contributions, and concealing the true source of contributions.[3] The State and GMA filed cross motions for summary judgment.

---

[3] GMA asserted a counterclaim, arguing that provisions of the Washington financial disclosure laws were unconstitutional under the First Amendment. GMA also filed a separate civil rights action against the attorney general in his official capacity. The trial court consolidated the State's lawsuit and GMA's lawsuit.

The trial court granted the State's motion for summary judgment regarding the requirement that GMA register as a political committee.[4] The trial court concluded that "GMA solicited and received political contributions from its members[,] which . . . it then used to oppose . . . [I-522]. . . . As a receiver of contributions, GMA qualified as a political committee under RCW 42.17A.005(37)." Clerk's Papers (CP) at 3339. The trial court ruled that from February 28, 2013 to the present, GMA had committed multiple violations of the FCPA. The trial court also ruled that the campaign finance laws at issue were not unconstitutionally vague as applied to GMA.

The court reserved for trial the "sole issue of whether GMA intentionally violated the law and if so, whether the judgment in this case should be trebled as punitive damages as allowed under RCW 42.17A.765(5)." CP at 3340.

*Trial on Penalties*

Before trial, the State filed a motion in limine to exclude evidence of conversations between GMA and the PDC regarding registering as a political committee. The State argued that such evidence was not relevant to the issue of whether GMA intended to violate the FCPA. The trial court granted the State's motion and stated in its oral ruling, "Anything that occurred after [February 28, 2013] does not apply to what GMA's intent was in proposing, creating, and implementing the [DOB] account." Report of Proceedings (RP) (Mar. 25, 2016) at 34.

GMA also filed a pretrial motion regarding the meaning of "intentional" in the context of RCW 42.17A.765(5). GMA argued that the State had to prove that GMA subjectively intended

---

[4] The State also alleged a violation of RCW 42.17A.442, which requires that a political committee receive contributions of $10 or more from registered Washington voters before making a contribution to another political committee. The trial court found this statute unconstitutional as applied to ballot measure committees. The State does not appeal this ruling.

to violate the law rather than merely intend to act in a way that happened to violate the law. The trial court ruled that proving an intentional violation under RCW 42.17A.765 required looking at "whether the person acted with the purpose of accomplishing an illegal act under RCW 42.17A." CP at 3684. The court ruled that "intentional" was not limited to a subjective intent to violate the law; i.e., where the person subjectively knew his or her actions were illegal and acted anyway.

The trial court held a bench trial on the issue of penalties and whether GMA intentionally violated the FCPA. The court heard testimony from Pamela Bailey, GMA President and CEO; Louis Finkel, former executive vice president of governmental affairs at GMA; Karin Moore, GMA's general counsel; three outside attorneys of GMA;[5] an expert witness called by GMA; and Tony Perkins of the PDC.

The trial court issued extensive findings of fact and conclusions of law. The court found that (1) GMA's plan was to identify only GMA as the source of GMO-related spending, providing anonymity for contributing members and shielding them from public scrutiny and state filing requirements; (2) one of the specific purposes of the DOB account was to eliminate the need to publicly disclose GMA members' contributions under state campaign finance disclosure laws; and (3) GMA approved the DOB account without asking its attorneys whether the account was legal under Washington law.

Further, the court made findings of fact that it was not credible that GMA executives (1) did not intend to violate Washington campaign finance laws, (2) believed that shielding its

---

[5] One of the significant issues at trial was GMA's affirmative defense of "advice of counsel." Many of the trial court's findings of fact related to this issue. The court concluded that GMA did not meet its burden of proving the defense. GMA does not appeal that conclusion and none of the appeal issues directly involves advice of counsel.

members as the true source of contributions to the DOB account was legal, and (3) believed that they did not have to disclose the funds in the DOB account during the I-522 campaign.

The trial court concluded that GMA intentionally violated the FCPA. The trial court imposed a $6 million civil penalty for GMA's multiple FCPA violations. The court then trebled the penalty "as punitive damages for GMA's intentional violations of state law." CP at 4072. The court entered a judgment against GMA for $18 million.

GMA appeals the trial court's orders granting the State's motion for summary judgment on the issue of whether GMA was required to register and report as a political committee and entering a final judgment for a civil penalty against GMA.

ANALYSIS

A.    FAIR CAMPAIGN PRACTICES ACT

In 1972, Washington citizens passed Initiative 276, which established the PDC and formed the basis of Washington's campaign finance laws. *Voters Educ. Comm. v. Pub. Disclosure Comm'n*, 161 Wn.2d 470, 479, 166 P.3d 1174 (2007). I-276 was codified in portions of Chapter 42.17A RCW, which generally is referred to as the Fair Campaign Practices Act (FCPA). *Voters Educ. Comm.*, 161 Wn.2d at 480; RCW 42.17A.909.

The purpose of I-276 was " 'to ferret out . . . those whose purpose is to influence the political process and subject them to the reporting and disclosure requirements of the act in the interest of public information.' " *Voters Educ. Comm.*, 161 Wn.2d at 480 (quoting *State v. (1972) Dan J. Evans Campaign Comm.*, 86 Wn.2d 503, 508, 546 P.2d 75 (1976)).

1.    Public Policy

RCW 42.17A.001 sets forth the declaration of policy of the FCPA. The public policy of the state includes:

(1) That *political campaign* and lobbying *contributions and expenditures be fully disclosed to the public* and that secrecy is to be avoided.
. . . .

(5) That public confidence in government at all levels is essential and must be promoted by all possible means.
. . . .

(10) That the *public's right to know of the financing of political campaigns* and lobbying and the financial affairs of elected officials and candidates far outweighs any right that these matters remain secret and private.

(11) That, mindful of the right of individuals to privacy and the desirability of the efficient administration of government, full access to information concerning the conduct of government on every level must be assured as a fundamental and necessary precondition to the sound governance of a free society.

(Emphasis added.) In addition, RCW 42.17A.001 states that "[t]he provisions of this chapter shall be liberally construed to promote complete disclosure of all information respecting the financing of political campaigns and lobbying."

2. Political Committee

The FCPA includes reporting and disclosure requirements for political committees to report to the PDC all contributions received and expenditures made. RCW 42.17A.235(1). Under former RCW 42.17A.005(37), a "political committee" means "any person . . . having the expectation of receiving contributions or making expenditures in support of, or in opposition to, any candidate or any ballot proposition."

A political committee must file a statement of organization with the PDC "within two weeks after organization or within two weeks after the committee first has the expectation of receiving contributions or making expenditures in any election campaign, whichever is earlier." RCW 42.17A.205(1). The statement of organization must provide detailed information about the political committee, including identifying a treasurer and the depository of funds. RCW 42.17A.205(2). The political committee also must file reports with the PDC at various intervals

9

that contain certain specified information.  RCW 42.17A.235, .240.  This information includes

the name of each person contributing funds to the committee and the amount of the contribution.

RCW 42.17A.235(3); RCW 42.17A.240(2).

The FCPA also prohibits concealing the source of contributions:

> No contribution shall be made and no expenditure shall be incurred, directly or indirectly, in a fictitious name, anonymously, or by one person through an agent, relative, or other person in such a manner as to conceal the identity of the source of the contribution or in any other manner so as to effect concealment.

RCW 42.17A.435.

3.    Civil Penalties

A person who violates any provision in chapter 42.17A RCW may be subject to a civil

penalty of not more than $10,000 for each violation.  RCW 42.17A.750(1)(c).  A person who

fails to timely file a required statement or report may be subject to a civil penalty of $10 per day

while the delinquency continues.  RCW 42.17A.750(1)(d).  A person who fails to report a

contribution or expenditure as required may be subject to a civil penalty equivalent to the amount

not reported.  RCW 42.17A.750(1)(f).

In an action brought to enforce the FCPA, the court may award to the State the costs of

investigation and trial, including reasonable attorney fees.  RCW 42.17A.765(5).

The court may treble the amount of the judgment, including costs, as punitive damages

"[i]f the violation is found to have been intentional."  RCW 42.17A.765(5).

B.    SUMMARY JUDGMENT – GMA AS A POLITICAL COMMITTEE

GMA argues that the trial court erred by granting the State's motion for summary

judgment on the issue of whether GMA became a political committee as defined in former RCW

42.17A.005(37).  We disagree.

10

1.    Standard of Review

We review a trial court's summary judgment order de novo.  *Utter v. Bldg. Indus. Ass'n of Wash.*, 182 Wn.2d 398, 406, 341 P.3d 953 (2015).  We view all facts and reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  *Id.*  Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *Id.*

The moving party bears the burden of first showing that there is no genuine issue of material fact.  *Zonnebloem, LLC v. Blue Bay Holdings, LLC*, 200 Wn. App. 178, 183, 401 P.3d 468 (2017).  " 'A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation.' "  *Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 864-65, 324 P.3d 763 (2014) (quoting *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008)).  If reasonable minds can reach only one conclusion on an issue of fact, that issue can be determined on summary judgment.  *Zonnebloem*, 200 Wn. App. at 183.

Here, the trial court's summary judgment order included extensive findings of fact.  Because our review is de novo, findings of fact in a summary judgment order are superfluous and we do not consider them.[6]  *Nelson v. Dep't of Labor & Indus.*, 198 Wn. App. 101, 109, 392 P.3d 1138 (2017).

---

[6] The trial court's findings of fact after trial included findings regarding whether GMA became a political committee and whether GMA violated reporting and disclosure requirements.  The court stated that these findings were included to correct its summary judgment findings of fact.  We also disregard those findings.

2.    Becoming a "Political Committee"

a.    Statutory Definition

Under former RCW 42.17A.005(37), a "political committee" means "any person . . . having the expectation of receiving contributions or making expenditures in support of, or in opposition to, any candidate or any ballot proposition."  Former RCW 42.17A.005(37) provides two alternative prongs under which an organization may become a political committee: " '(1) expecting to receive or receiving contributions, or (2) expecting to make or making expenditures to further electoral political goals.' "  *Utter*, 182 Wn.2d at 415 (quoting *State ex rel. Evergreen Freedom Found. v. Wash. Educ. Ass'n*, 111 Wn. App. 586, 598, 49 P.3d 894 (2002) (*EFF*)).  The organization's expectation is what matters, and the expectation requirement applies to both the contributions and expenditures prongs.  *Utter*, 182 Wn.2d at 416.  And the contributions must be received and the expenditures made "in support of, or in opposition to, any candidate or any ballot proposition."  Former RCW 42.17A.005(37).

As with all FCPA provisions, former RCW 42.17A.005(37) must be liberally construed "to promote complete disclosure of all information respecting the financing of political campaigns."  RCW 42.17A.001.  On the other hand, "[t]he definition of political committee was not meant to indiscriminately include all those who seek to influence government by their support or opposition to candidates or ballot propositions."  *EFF*, 111 Wn. App. at 601-02.

The definition of "political committee" is a question of law that we review de novo.  *Id.*

b.    Contributions Prong

Regarding the contributions prong, a special standard applies to organizations like GMA that primarily are funded through payments from members.  *Id.* at 602-03.  This court in *EFF* relied on a 1973 Attorney General Letter Opinion in holding that an organization meets the

receiver of contributions prong "if the members are called upon to make payments that are segregated for political purposes and the members know, or reasonably should know, of this political use." *Id.* at 602 (citing 1973 Letter Op. Att'y Gen. No. 114, at 4). Similarly, the court stated that member payments are contributions "if the membership makes payments that are segregated into a fund for political purposes and the membership knows or should know of this segregation." *EFF*, 111 Wn. App. at 602.

Under this standard, this court in *EFF* held that the Washington Education Association (WEA) was not a political committee because membership dues were paid into "the WEA general fund, which was not segregated in any manner for political expenditures." *Id.* at 603. As a result, the members "would have had no actual or constructive knowledge that their membership dues would be used for electoral political activity." *Id.*

c.    Expenditures Prong

Regarding the expenditures prong, the statutory requirement is that an organization expects to make expenditures in support of a candidate or ballot initiative. Former RCW 42.17A.005(37). Because of First Amendment concerns, courts also have imposed a second requirement: one of the organization's primary purposes must be political advocacy. *Utter*, 182 Wn.2d at 423-27.

In *Utter*, the Supreme Court emphasized that political advocacy must only be *a* primary purpose of an organization to meet the expenditures prong, and expressly rejected the argument that political advocacy must be *the* primary purpose of an organization. *Id.* at 427. "But if electoral political activity is merely one means the organization uses to achieve its legitimate broad nonpolitical goals, electoral political activity cannot be said to be one of the organization's primary purposes." *EFF*, 111 Wn. App. at 600.

13

     d.    "Primary Purpose" Requirement for Contributions Prong

GMA argues that we also should apply a "primary purpose" requirement to the contributions prong as well as to the expenditures prong. GMA acknowledges that no court has adopted this second requirement for the contributions prong. But GMA relies on the following statement in *Utter*:

> Clearly . . . an entity can meet the definition of a "political committee" under either the "receiving contributions" or "making expenditures" portion of the statutory definition, *plus whatever "purpose" test might also be added on to that statutory definition*.

182 Wn.2d at 416 (emphasis added). GMA claims that this passage essentially states that a primary purpose test should apply to both prongs of the definition of political committee.

However, the language of former RCW 42.17A.005(37) contains no primary purpose requirement for the contributions prong. And courts have not imposed one, even though they have had the opportunity. Immediately after the statement GMA quotes, the court in *Utter* proceeded to discuss the contributions prong without any suggestion that a primary purpose requirement applied to that prong. *Id.* at 416-19. The court addressed a primary purpose requirement – in great detail – only with reference to the expenditures prong. *Id.* at 423-27. And this court in *EFF* also discussed a primary purpose requirement for the expenditures prong, and then addressed the contributions prong without mentioning a primary purpose requirement. 111 Wn. App. at 598-603.

In addition, as the State notes, there is a fundamental difference between spending money on an election and receiving contributions from others to spend on an election. If an organization receives contributions and places them in a segregated fund to support or oppose a Washington initiative, that activity is subject to the FCPA regardless of whether advocating for or against the initiative is a primary purpose of the organization.

14

Because neither the Supreme Court nor this court have extended a primary purpose requirement to the contributions prong, we decline to do so.

3.    Contributions Prong Analysis

The trial court ruled that GMA became a political committee only under the contributions prong of former RCW 42.17A.005(37).  And the State does not argue on appeal that the expenditures prong applies for purposes of upholding the trial court's summary judgment order.  Therefore, we need only address the contributions prong.

GMA does not dispute that several elements of the *EFF* analysis were satisfied here.  As of the February 28, 2013 board meeting, GMA members were asked to make special payments and GMA expected to receive those payments.  Those payments were to be segregated into a separate account.  And the members knew that the payments would be placed into a segregated account.

The only material fact that GMA challenges is whether, when the DOB account was established, GMA had an expectation of receiving contributions "in opposition to . . . any ballot proposition."  Former RCW 42.17A.005(37).

GMA makes three arguments regarding the trial court's summary judgment order.  First, it argues that GMA's and its members' expectations in creating the DOB account involved questions regarding their mental state, which should not be resolved on summary judgment.  However, like any other issue, a party's mental state can be resolved on summary judgment if there is no genuine issue of material fact on the issue.  GMA cites no authority to the contrary.

Second, GMA argues that reasonable minds could differ as to whether GMA established the DOB account to fund opposition to I-522.  GMA points to evidence that (1) it first conceived of the account in August 2012, before it knew of I-522; and (2) the February 28, 2013 board

15

minutes describe five strategic objectives of the account, only one of which was to oppose state efforts to impose mandatory labels.

There is no question that the summary judgment evidence, viewed in a light most favorable to GMA, showed that the DOB account was conceived and approved to fund multiple projects. However, there also was undisputed evidence that GMA had an expectation that the fund would be used to oppose I-522 if that initiative was placed on the ballot. The board minutes GMA cites also stated, "[I]f the referendum in Washington were to pass, it could make success on other fronts very unlikely to succeed. As a consequence, Washington was critical to the success of the overall objective." CP at 1909. Further, the proposed budget for the DOB account showed spending of $10 million in 2013 (from total contributions of $16.25 million) on the Washington ballot measure campaign.[7] Other evidence made it clear that GMA expected that member contributions to the DOB account would be used in significant part to fund opposition to I-522. For example, GMA included an update on I-522 opposition efforts with its DOB account invoices.

Third, GMA argues that when the DOB account was created, GMA had made no final decision about spending the funds in Washington. GMA points to evidence that (1) GMA was waiting for polling results to decide whether to spend money in Washington; and (2) GMA did not decide to contribute to the "No on I-522" campaign until after I-522 qualified for the ballot in April 2013.

---

[7] GMA argues that it submitted evidence that the budget numbers were merely approximations. But regardless of the specific amounts, the proposed budgets unequivocally showed that GMA expected to spend a significant amount of the DOB account in opposition to I-522.

Again, there is no question that the summary judgment evidence, viewed in a light most favorable to GMA, showed that GMA was not completely certain on February 28, 2013 that the DOB account would be used to fund opposition to I-522. But former RCW 42.17A.005(37) does not require certainty. If an organization has the *expectation* of receiving contributions in opposition to a ballot proposition, it becomes a political committee. Former RCW 42.17A.005(37). There was undisputed evidence that GMA expected that I-522 would be placed on the ballot, that GMA expected to receive contributions from certain member companies to the DOB account, and that GMA expected to spend a significant amount of money from the DOB account opposing I-522.

Further, there was absolute certainty that GMA expected to receive contributions in opposition to I-522 by at least May 8, 2013, when GMA made its first contribution to "No on I-522." After that point, GMA still invoiced its members to fund the DOB account. But GMA did not register as a political committee at that time.

We hold that because there is no genuine issue of material fact that GMA expected to receive contributions – and did in fact receive contributions – to oppose I-522, it qualified as a political committee under former RCW 42.17A.005(37). Accordingly, we affirm the trial court's order granting summary judgment in favor of the State on this issue.

C.    FIRST AMENDMENT CHALLENGE TO FCPA

GMA argues that as applied in this case, the FCPA violated its First Amendment right to engage in political speech. GMA claims that under the exacting scrutiny standard, the FCPA requirements that are applicable here are not substantially related to the State's interest in providing voters with information about the persons opposing ballot initiatives. We disagree.

17

1.  Legal Standard

Statutes are generally presumed to be constitutional, and the party challenging a statute has the burden of proving unconstitutionality beyond a reasonable doubt. *Voters Educ. Comm.*, 161 Wn.2d at 481. However, where a statute impacts First Amendment rights, the State generally has the burden to justify a restriction on speech. *Id.* at 482.

Statutes that regulate speech based on content are subject to strict scrutiny. *Rickert v. Pub. Disclosure Comm'n*, 161 Wn.2d 843, 848, 168 P.3d 826 (2007). However, statutes that merely impose disclosure requirements are subject to the less stringent "exacting scrutiny" test. *Voters Educ. Comm.*, 161 Wn.2d at 482. Under this standard, disclosure requirements must have a relevant correlation or substantial relation to a government interest. *Id.* We must determine whether (1) the disclosure requirements promote a sufficiently important government interest, and (2) there is a substantial relationship between the disclosure requirements and that interest. *Utter*, 182 Wn.2d at 434; *Voters Educ. Comm.*, 161 Wn.2d at 482.

2.  Government Interest

Courts consistently have recognized that the State has an important government interest in providing voters with information regarding persons involved with supporting or opposing ballot initiatives. In *State ex rel. Pub. Disclosure Comm'n v. Permanent Offense*, the court stated:

> Washington State has a *substantial interest in providing the electorate with valuable information about who is promoting ballot measures and why they are doing so.* In short, the voters need to know "who is doing the talking" about ballot measures. Moreover, it is particularly important in these situations that voters know whether other influences—particularly money—are affecting those who are otherwise known as grass-roots organizers. Finally, the State has a substantial interest in promoting integrity and preventing concealment that could harm the public and mislead voters.

136 Wn. App. 277, 284, 150 P.3d 568 (2006) (emphasis added).

18

In *Voters Education Committee*, the Supreme Court identified providing the electorate with information and preventing corruption as important government interests. 161 Wn.2d at 482. The court also emphasized that the First Amendment protects not only the right to free speech, but also assures the public's right to receive information. *Id.* at 483. Campaign disclosure laws promote political speech, and parties who challenge those laws " 'never satisfactorily answer the question of how uninhibited, robust, and wide-open speech can occur when organizations hide themselves from the scrutiny of the voting public.' " *Id.* (emphasis in original deleted) (quoting *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 196, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003).

In *Human Life of Washington, Inc. v. Brumsickle*, a Ninth Circuit case addressing the constitutionality of certain FCPA provisions, the court highlighted the importance of informing voters where money comes from in relation to ballot initiative campaigns. 624 F.3d 990, 1007 (9th Cir. 2010). The court recognized that in the initiative process, voters essentially act as legislators, and they need to know who is lobbying for their vote. The court stated:

> Campaign finance disclosure requirements thus advance the important and well-recognized governmental interest of providing the voting public with the information with which to assess the various messages vying for their attention in the marketplace of ideas. *An appeal to cast one's vote in a particular way might prove persuasive when made or financed by one source, but the same argument might fall on deaf ears when made or financed by another.*

*Id.* at 1008 (emphasis added).

Finally, this court in *State v. Evergreen Freedom Foundation* noted the government interests identified in the cases discussed above, but also referred to the policy supporting the FCPA: "The goal of disclosure was intended to improve public confidence in the fairness of elections and government processes and to protect the public interest." 1 Wn. App.2d 288, 309, 404 P.3d 618 (2017), *review granted*, 190 Wn.2d 1002, 413 P.3d 11 (2018).

19

3.    Substantial Relationship to Government Interest

GMA acknowledges that the State has an interest in the disclosure of campaign contributions. But GMA argues that the State cannot show that the FCPA's reporting and disclosure requirements are substantially related to that interest as applied to GMA. We disagree.

a.    Legal Principles

Under the exacting scrutiny standard, the State need not show that the challenged law represents the *least restrictive* means of furthering the important government interest, only that the law is substantially related to that interest. *Brumsickle*, 624 F.3d at 1013. Courts have recognized that disclosure requirements – as opposed to limitations on campaign spending – often are the least restrictive means of promoting the interests of voter information and curbing corruption. *Voters Educ. Comm.*, 161 Wn.2d at 482-83; *see also Citizen's United v. Fed. Election Comm'n*, 558 U.S. 310, 369, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010).

In an as-applied challenge, which GMA makes here, the question is whether an otherwise valid law is unconstitutional as applied to the party challenging it. *Didlake v. State*, 186 Wn. App. 417, 423, 345 P.3d 43 (2015). This review is heavily dependent on the specific facts demonstrating the burdens imposed on the party challenging the law. *See Utter*, 182 Wn.2d at 430. The party challenging the law as applied must present a sufficient factual record for the reviewing court to perform the exacting scrutiny analysis. *See id.* (holding that an as applied constitutional challenge was not ripe for review because the factual record was insufficient).

b.    Misleading of Voters

GMA argues that disclosing names of the contributors to the DOB account as required in RCW 42.17A.235(3) is not substantially related to the State's interest because no voters would

be misled by nondisclosure. GMA claims that the name "Grocery Manufacturers Association" gave notice to voters that grocery manufacturers were funding the opposition to I-522 and therefore was sufficient to satisfy the State's interest in identifying the source of political contributions.

However, even though GMA's name may not be misleading, informing voters that GMA was opposing I-522 was not the same as informing voters which specific companies were funding the efforts to defeat I-522. Disclosing that a nationwide association of "grocery manufacturers" is opposing the initiative is not particularly informative because "grocery manufacturers" is such a broad category. GMA acknowledged that any company selling anything in a supermarket was either a GMA member or eligible to be a member.

Knowing the names of the companies actually funding GMA's efforts – and particularly the types of products those companies sell – would be valuable to voters. For example, the three companies contributing significantly more money than the others were PepsiCo, Inc., Nestle USA, Inc., and The Coca Cola Company. Voters may have been able to discern from this information that beverage manufacturers were particularly concerned about GMO labeling.

In addition, it was important for voters to know which GMA members were *not* opposing I-522. GMA was not making contributions from payments by all GMA members. Only a relatively small group of companies – only 34 companies were listed in GMA's initial disclosure – were funding the opposition effort, and some members declined to participate. Identifying the I-522 opponent as GMA did not provide that information and could have mislead voters.

  c. No Primary Purpose to Influence Elections

GMA argues that applying the FCPA disclosure and reporting requirements to nationwide, general-purpose trade organizations like GMA that do not have a primary purpose of

influencing elections is over inclusive. GMA claims that the rule stated in *EFF* requiring an organization to register as a political committee when it creates a fund segregated for political purposes should be applied only to traditional, in-state political action committees.

As discussed above, Washington courts have not applied a primary purpose requirement to the contributions prong of the definition of political committee. *Utter*, 182 Wn.2d at 416-19; *EFF*, 111 Wn. App. at 602-03. GMA is not arguing in this context that we adopt a primary purpose requirement. Its argument is that in the *absence* of a primary purpose requirement, the FCPA regulations burden organizations like GMA more than they further the State's interests.

GMA's argument may be valid in some contexts, but not under the facts in this case. The undisputed evidence here was that GMA budgeted $10 million of the $16.5 million it planned to obtain from its members for the DOB account to oppose I-522 in Washington. At least regarding the DOB account, one of GMA's primary purposes was to influence the Washington election on I-522. In this context, there is a substantial relationship between the FCPA disclosure and reporting requirements and the State's interests in providing voters with information about persons opposing ballot initiatives.

### d. Burden on Associational Rights

GMA argues that the burden on its associational rights outweighs the State's interest because GMA members faced threats and boycotts if they were identified as contributors to the I-522 opposition. GMA claims that they have a right to member anonymity.

The United States Supreme Court has acknowledged that disclosure requirements may fail exacting scrutiny as applied to a specific group if the group can show " 'a reasonable probability that the compelled disclosure . . . will subject them to threats, harassment, or reprisals from either Government officials or private parties.' " *Doe v. Reed*, 561 U.S. 186, 200, 130 S.

Ct. 2811, 177 L. Ed. 2d 493 (2010) (quoting *Buckley v. Valeo*, 424 U.S. 1, 74, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)).  A review of cases discussing this issue is instructive.

In *NAACP v. Alabama*, the Court addressed a law that required the National Association for the Advancement of Colored People (NAACP) to reveal the names of its members and agents in Alabama.  357 U.S. 449, 451, 78 S. Ct. 1163, 2 L. Ed 2d 1488 (1958).  The appellants made an "uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility."  *Id.* at 462.  However, the State was unable to show an interest that was sufficient to justify the detrimental effect disclosure would have on NAACP members' associational rights.  *Id.* at 463-64.  The Court held that under these facts, disclosure was not required.  *Id.* at 466.

In *Buckley*, minor political parties challenged the Federal Election Campaign Act on the basis that reporting and disclosure requirements could subject contributors to those parties to harassment.  424 U.S. at 69.  The Court stated that there could be cases similar to *NAACP v. Alabama* where the threat to First Amendment rights is "so serious" and the state's interest is "so insubstantial" that the Act's requirements would be unconstitutional.  *Id.* at 71.  The organization would have to show a "reasonable probability" that a disclosure of contributors' names would subject them to "threats, harassment, or reprisals."  *Id.* at 74.  "The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself.  A pattern of threats or specific manifestations of public hostility may be sufficient."  *Id.*

But the Court ruled that the appellants had not provided any evidence of a similar scale of harassment and that any serious infringement of First Amendment rights was highly speculative.

23

*Id.* at 70-71. Specifically, the appellants had not met the reasonable probability standard by merely presenting articulated fears of harassment without showing focused and insistent harassment. *Id.* at 71-72.

In *Reed*, the Court again held that the plaintiffs did not meet the required showing of a reasonable probability of threats or harassment. 561 U.S. at 199-201. There, the plaintiffs alleged that requiring disclosure of the names of individuals who signed a Washington referendum petition did not meet exacting scrutiny as applied because opposing groups planned to post the disclosed information on the internet, where it would "effectively become a blueprint for harassment and intimidation." *Id.* at 200. The plaintiffs offered evidence of harassment against individuals who signed a similar petition in California. *Id.* The Court stated that the plaintiffs offered little evidence to support the claim that disclosure would lead to harassment and that other controversial petitions had been subject to disclosure without incident. *Id.* at 201.

Here, GMA presented minimal evidence that their members suffered adverse consequences because of their opposition to the California GMO initiative. Bailey testified that (1) "[t]hese are not pleasant campaigns; there were death threats. There were all sorts of things that went on," CP at 1765; (2) "[c]ompanies were picketed, their Facebook pages were taken down," CP at 1540; and (3) "companies were having their Facebook pages attacked. . . . [T]here were certain campaigns to get companies to withdraw from GMA membership." CP at 1771

But the evidence GMA offered is similar to the evidence deemed not sufficient to prevent disclosure in *Buckley* and *Reed*. GMA's generalized concerns do not establish a reasonable probability that GMA member companies would suffer the type of adverse impacts that would have had a chilling effect on freedom of association or political speech. In addition, as discussed above, the State has a compelling interest in informing the voters about who is contributing

money to initiative campaigns. GMA has not shown that the threat of negative impacts would outweigh this State interest.[8]

  e. Summary

We hold that as applied in this case, the substantial relationship between the FCPA disclosure and reporting requirements and the State's interest in providing information to voters was not negated by the facts that (1) GMA's name provided some information about the identity of the companies opposing I-522, (2) GMA is a nationwide, general-purpose organization that does not have a primary purpose of influencing elections, and (3) GMA member companies potentially could have received threats and boycotts for opposing I-522. Accordingly, we hold that the FCPA provisions at issue here did not violate GMA's First Amendment rights.

## D. VAGUENESS CHALLENGES

GMA challenges on vagueness grounds (1) the definition of "political committee" in former RCW 42.17A.005(37) and (2) certain provisions in RCW 42.17A.435, which prohibits concealment of a contribution source. We hold that these statutes are not unconstitutionally vague.

  1. Legal Principles

Under the Fourteenth Amendment, a statute may be void for vagueness if it is framed in terms so vague that persons of common intelligence must guess at its meaning and cannot agree on its application. *Voters Educ. Comm.*, 161 Wn.2d at 484. A vague statute that regulates

---

[8] GMA cites *Right-Price Recreation, LLC v. Connells Prairie Community Council*, 105 Wn. App. 813, 21 P.3d 1157 (2001). However, this case discussed the implications of required disclosure in the context of discovery, not public elections. *See also Eugster v. City of Spokane*, 121 Wn. App. 799, 807-10, 91 P.3d 117 (2004). Civil discovery cases do not involve the State's interest in providing information to voters.

speech also infringes on First Amendment rights. *Id.* A statute must have a greater degree of specificity and clarity of purpose when First Amendment freedoms are at stake. *Id.* at 485.

The goals of the vagueness doctrine are to provide fair notice of what conduct is prohibited and to protect against arbitrary enforcement. *Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 114, 11 P.3d 726 (2000). Uncertainty as to the statute's meaning alone does not make the statute impermissibly vague. *Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 570, 613, 192 P.3d 306 (2008). To determine whether a statute is sufficiently definite, we look to the provision in question within the context of the enactment, giving language a sensible, meaningful, and practical interpretation. *Id.* A statute is not invalid simply because it could have been drafted with greater precision. *Id.* A statute's language is sufficiently clear when it provides explicit standards for those who apply them and provides a person of ordinary intelligence a reasonable opportunity to know what is prohibited. *See Voters Educ. Comm.*, 161 Wn.2d at 488-89.

The party asserting that a statute is unconstitutionally vague must prove its vagueness beyond a reasonable doubt, even when the First Amendment is implicated. *See Catsiff v. McCarty*, 167 Wn. App. 698, 709, 274 P.3d 1063 (2012). A facial challenge asserts that the statute cannot be properly applied in any context. *City of Spokane v. Douglass*, 115 Wn.2d 171, 182 n.7, 795 P.2d 693 (1990). A challenge that a statute is improperly vague as applied must be considered in light of the facts of the specific case before the court. *Am. Legion Post No. 149*, 164 Wn.2d at 612. Here, GMA makes only an as applied challenge.

2. "Expectation" of Receiving Contributions in Former RCW 42.17A.005(37)

Former RCW 42.17A.005(37) defines "political committee" as any person or organization "having the *expectation* of receiving contributions or making expenditures in

26

support of, or opposition to, any candidate or any ballot proposition." (Emphasis added.) GMA argues that the term "expectation" in this statute is impermissibly vague because it is unclear whether expectation (1) refers to a near certainty as opposed to a possibility, and (2) refers only to organizations with a primary purpose of influencing Washington elections. We disagree.

In *Brumsickle*, the Ninth Circuit considered a challenge that "expectation" in an earlier version of former RCW 42.17A.005(37) was impermissibly vague.[9] 624 F.3d at 1020-21. The organization in that case argued that "expectation" was vague because "it could be interpreted to mean anything from a 'hope' to a 'contract.' " *Id.* at 1020. The court noted that an entity would qualify as a political committee under the contributions prong if it "has given the public 'actual or constructive knowledge that the organization is setting aside funds to support or oppose a candidate or ballot proposition.' " *Id.* (quoting *EFF*, 111 Wn. App. at 602). The court summarily held that the term "expectation" was not unconstitutionally vague because the actual or constructive knowledge requirement grafted into that term provided the "concrete, discernible criteria necessary to prevent arbitrary and discriminatory enforcement." *Brumsickle*, 624 F.3d at 1021.

*Brumsickle* is not binding authority, and the court's analysis of vagueness was fairly minimal. 624 F.2d at 1020-21. But the court's reasoning is compelling. This court in *EFF* provided a very specific rule for when an organization like GMA that receives contributions from its members becomes a political committee: member payments are contributions to a political committee if the payments are segregated into a fund for political purposes and the members know or should know that the fund will be used for those purposes. 111 Wn. App. at

---

[9] *Brumsickle* interpreted the meaning of "expectation" in former RCW 42.17.010, which was recodified as RCW 42.17A.005 by Laws 2010 ch. 204, § 1102.

602. There is nothing vague about that rule. The fact that there may be some uncertainty as to how the rule applies in certain cases does not make "expectation" vague. *See Am. Legion Post No. 149*, 164 Wn.2d at 612-13.

GMA makes two arguments to support its vagueness challenge. First, GMA takes the position that "expectation" in former RCW 42.17A.005(37) appears to require an organization to know with near certainty that contributions it receives will be used to influence a Washington election. GMA argues that a reasonable interpretation of former RCW 42.17A.005(37) is that contributions must be specifically earmarked for use in a Washington election for an organization to become a political committee. GMA claims that Washington cases support this interpretation.

GMA points out that the trial court's interpretation in this case was that an organization becomes a political committee if contributions it received *may be* used in a Washington election. GMA claims that the court applied the FCPA requirements even though the use of the DOB account funds to oppose I-522 was only one of several possible options, and was not a certainty. GMA argues that the tension between the near-certainty standard and a possibility standard makes "expectation" vague.[10]

But GMA's argument is not valid under the facts in this case. The undisputed evidence here was that GMA solicited contributions from its members for the DOB account with knowledge that some of the funds in the account probably would be used to oppose I-522 in Washington. GMA's expectation was much closer to near certainty than to mere possibility, and

---

[10] GMA also claims that the vagueness of "expectation" is underscored by what it believes has been the State's "erratic enforcement" of former RCW 42.17A.005(37). GMA attaches as an appendix a table purporting to show this erratic enforcement. But how the State enforced the political committee definition in other cases is not directly relevant to an as applied challenge.

that expectation became a certainty when GMA began contributing to the "No on I-522" campaign in May 2013.

Second, GMA argues that in the absence of a primary purpose test for nationwide, multi-purpose organizations, the term "expectation" in former RCW 42.17A.005(37) is vague. GMA claims that such an organization would not have fair notice that its conduct in receiving contributions that may be used in a Washington election would require reporting and disclosure in Washington.

But this case does not involve a situation in which an organization collected money from its members for general purposes and only later decided to spend that money in a Washington election. One of GMA's stated goals was to oppose I-522, a Washington initiative. And GMA expected to receive contributions from its members to use for that specific purpose. As a result, GMA had fair notice that FCPA regulations would apply to its activities.

We hold that the term "expectation" in former RCW 42.17A.005(37) is not vague as applied to GMA.

3. "Concealment" and "Source" in RCW 42.17A.435

RCW 42.17A.435 states: "No contribution shall be made and no expenditure shall be incurred, directly or indirectly, in a fictitious name, anonymously, or by one person through an agent, relative, or other person in such a manner as to conceal the identity of the source of the contribution or in any other manner so as to effect concealment." GMA argues that this statute is impermissibly vague because it is unclear whether (1) "concealment" requires some independent act in addition to failing to register as a political committee, and (2) "source" of contributions refers to GMA or to the GMA members who funded the DOB account.

29

The only case that addresses RCW 42.17A.435 is *Permanent Offense*, 136 Wn. App. at 288-89, which interpreted the meaning of the former version of the statute.[11] The court noted that the language of the statute must be liberally construed to promote complete disclosure of all information regarding the financing of political campaigns. *Id.* at 288. The court focused on the phrase "or in any other manner so as to effect concealment," RCW 42.17A.435, and stated that this broad language covered any action that resulted in concealment. *Id.* at 289.

First, GMA argues that RCW 42.17A.435 must be interpreted as requiring an independent act or omission besides the failure to comply with other FCPA regulations. GMA claims that apart from failing to register as a political committee, there is no evidence that GMA acted in a way that concealed anything.

However, this is not a vagueness argument. GMA is making a legal argument regarding the proper interpretation of RCW 42.17A.435. No court has addressed whether a violation of RCW 42.17A.435 requires some conduct other than failing to comply with FCPA requirements. But the fact that a court has not yet interpreted a statute does not make it vague. *See Cascade Floral Products, Inc. v. Dep't of Labor & Indus.*, 142 Wn. App. 613, 618-19, 177 P.3d 124 (2008) ("[T]he possibility of different meanings alone does not render a statute vague."); *see also Douglass*, 115 Wn.2d at 180 (stating that undefined statutory terms are not necessarily vague).

GMA essentially is arguing that the trial court erred in granting summary judgment regarding a violation of RCW 42.17A.435 because GMA committed no independent act of concealment. However, even under GMA's independent act standard, there was undisputed

---

[11] *Permanent Offense* interpreted the concealment language of former RCW 42.17.120, which was recodified as RCW 42.17A.435 by Laws 2010, ch. 204, § 1102.

evidence at summary judgment that GMA deliberately concealed the identity of its members who contributed to the DOB account.

Second, GMA argues that the term "source" in RCW 42.17A.435 is vague because it could refer to the immediate source of the contributions from the DOB account opposing I-522 – GMA – or to the members who funded the DOB account.

However, RCW 42.17A.435 clearly refers to concealment of the identity of *both* the person making the contribution (fictitious name, anonymously) and some other person besides the person making the contribution (one person making a contribution through an agent, relative, or other person). Regarding the second category, the "source" of the contribution necessarily must refer to the person actually providing the money to the "other person" who is making the contribution.

The GMA members actually were providing the money for the contributions opposing I-522, and GMA was the agent or "other person" physically making the contributions. In structuring the contributions in this manner, GMA deliberately concealed the actual source of the contributions – certain GMA members. The statutory language provided fair notice to GMA.

Further, the last clause of RCW 42.17A.435 does not contain the term "source." A person violates RCW 42.17A.435 by making a contribution "in any other manner so as to affect concealment." As the court stated in *Permanent Offense*, this clause is broadly interpreted to cover concealment of any manner. 136 Wn. App. at 288-89. The fact that a statute is broad does not make it vague. *See Am. Legion Post No. 149*, 164 Wn.2d at 613 (stating that a statute is not unconstitutionally vague "simply because it could have been drafted with greater precision").

We hold that the terms "concealment" and "source" in RCW 42.17A.435 are not vague as applied to GMA.

31

E.      EXCLUSION OF EVIDENCE OF COMMUNICATION AND COOPERATION WITH PDC

GMA argues that the trial court erred at trial in excluding as irrelevant evidence that it communicated and cooperated with the PDC and acted in good faith. We disagree.

Under ER 402 only relevant evidence is admissible. Evidence is relevant if it has any tendency to make the existence of any material fact more or less probable than without the evidence. ER 401. We review a trial court's evidentiary rulings for an abuse of discretion. *Gilmore v. Jefferson County Pub. Transp. Benefit Area*, 190 Wn.2d 483, 494, 415 P.3d 212 (2018). An abuse of discretion exists when the trial court's decision is manifestly unreasonable or based on untenable grounds. *Id.*

Here, the trial court ruled that evidence that GMA communicated and cooperated with the PDC was not relevant to the issue at trial of whether GMA intended to violate the campaign financial disclosure laws. GMA argues that evidence of cooperation with the PDC may have resulted in a smaller penalty, but GMA does not explain how. The primary factual issue before the trial court was whether GMA intended to violate campaign financial disclosure laws. GMA does not suggest how evidence of its communications in October would relate to its intent to violate the law in February.

We hold that the trial court did not abuse its discretion in excluding evidence of communication between GMA and the PDC after February 28, 2013.

F.      IMPOSITION OF PUNITIVE DAMAGES FOR INTENTIONAL VIOLATION

GMA argues that the trial court erred in imposing punitive damages under RCW 42.17A.765(5) based on a finding that GMA's violation of the law was intentional. We hold that the trial court erred in ruling as a matter of law that GMA did not need to subjectively intend to violate the law in order to be subject to treble damages under RCW 42.17A.765(5).

32

1.    Legal Principles

Under RCW 42.17A.765(5), the court may treble the amount of an FCPA judgment as punitive damages "[i]f the violation is found to have been intentional."  Chapter 42.17A RCW does not define "intentional" for the purposes of imposing treble damages.

Whether the trial court correctly interpreted RCW 42.17A.765(5) is a matter of statutory interpretation and a question of law that we review de novo.  *See Utter*, 182 Wn.2d at 406.  The primary goal of statutory interpretation is to give effect to the legislature's intent.  *Wright v. Lyft, Inc.*, 189 Wn.2d 718, 722, 406 P.3d 1149 (2017).  We begin with the statute's plain language and give undefined statutory terms their usual and plain meaning.  *AllianceOne Receivables Mgmt., Inc. v. Lewis*, 180 Wn.2d 389, 395, 325 P.3d 904 (2014).

2.    Trial Court Ruling

Before trial, the trial court issued a ruling on the meaning of "intentional" under RCW 42.17A.765(5).  The court stated that whether a violation is intentional depends upon whether a person intends to engage in the conduct that resulted in a violation of the law, and not on whether the person knew that the conduct constituted a violation of the law.  The court concluded:

> 2. To determine whether a violation is intentional under RCW 42.17A.765, Washington law requires the Court to look at *whether the person acted with the purpose of accomplishing an illegal act* under RCW 42.17A.
>
> 3. "Intentional" for purposes of RCW 42.17A.765 *is not limited to instances where the person acted with subjective intent to violate the law*.  In other words, it is not limited to only those instances where the person subjectively knew their actions were illegal and acted anyway.

CP at 3684 (emphasis added).

3.    Meaning of "Intentional" under RCW 42.17A.765(5)

GMA argues that the trial court erred in concluding in its pretrial ruling that whether GMA subjectively intended to violate the FCPA is irrelevant under RCW 42.17A.765(5).  GMA

33

claims that the syntax of the statutory language – if "the violation is found to have been intentional," RCW 42.17A.765(5) – shows that "the person must have intended to violate the law at the precise moment that the person acted." Br. of Appellant at 39.

The State argues that "intentional" in RCW 42.17A.765(5) requires that the person act with a purpose of accomplishing an act that is illegal, but it does not require a person to know that the act was illegal. The State relies on the concept that a person legally intends the consequences that are certain or substantially certain to result from an act. *Bradley v. Am. Smelting & Refining Co.*, 104 Wn.2d 677, 683, 709 P.2d 782 (1985).

Both parties rely on RCW 9A.08.010(1), which defines intent in the context of criminal statues: "A person acts with intent or intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime." GMA argues that the "result" that GMA needed to intend was a violation of the law, not an act later held to be a violation. The State argues that under this statute, there is no requirement that the actor have knowledge that his or her conduct is illegal.

We agree with GMA. The plain language of RCW 42.17A.765(5) states that the *violation* must be intentional, not that the conduct giving rise to the violation must be intentional. This language makes it clear that a party must have knowledge that it was violating the law to be subject to treble damages. The fact that GMA deliberately engaged in conduct that the trial court *later* determined was a violation of the FCPA does not mean that GMA intended to violate the FCPA.

Further, the legislature could have used different language in RCW 42.17A.765(5) that would have focused on a party's intent to engage in certain conduct rather than intent to violate the law. For example, the legislature could have allowed for treble damages if a party

34

intentionally *failed to register* as a political committee. Under such language, GMA would be subject to treble damages because it clearly intended not to register. Whether GMA knew that failing to register was a violation of the law would be immaterial. But the legislature did not use that language.

We hold that the trial court erred in ruling that GMA did not need to subjectively intend to violate the law in order to be subject to treble damages under RCW 42.17A.765(5).[12] Because the trial court's conclusion that GMA intended to violate the law was based on this erroneous ruling, that conclusion cannot stand.

G.    ATTORNEY FEES ON APPEAL

GMA requests an award of attorney fees and costs on appeal under RAP 18.1, which allows a party to recover attorney fees on appeal if allowed under the applicable law. GMA argues that it is entitled to attorney fees under both 42 U.S.C. § 1988 and RCW 42.17A.765(5). We disagree.

Both 42 U.S.C. § 1988 and RCW 42.17A.765(5) allow the prevailing party to recover attorney fees. Although GMA prevailed on one issue, it did not prevail on any of the other issues. Because GMA is not the substantially prevailing party in this appeal, we decline to award attorney fees to GMA.

CONCLUSION

We affirm the trial court's order granting summary judgment in favor of the State, reverse the trial court's imposition of treble damages against GMA, and remand for further

---

[12] This interpretation would not preclude a trial court from inferring subjective intent based on the actor's conduct or based on the expected consequences of the conduct.

proceedings for the trial court to determine whether GMA is subject to treble damages under the proper legal standard.

_____
MAXA, C.J.

We concur:

_____
WORSWICK, J.

_____
LEE, J.